James R. ELLIS, Plaintiff,

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, and Provident Life & Casualty Insurance Company, Defendants.**

No. 91 Civ. 7074(MP).

United States District Court, S.D. New York.

May 22, 1996.

Liddle Robinson & Shoemaker by Jeffrey L. Liddle, W. Dan Boone, James A. Batsom, New York City, for Plaintiff.

Taft Stettinus & Hollister, by J. Alan Lips, Gregory Parker Rogers, Cincinnati, Ohio, of counsel: Paul, Hastings, Janofsky & Walker, by Patrick Shea, Stamford, CT, J. Hartley Echerd, Provident Life & Accident Ins. Co., Chattanooga, TN, Friedman & Kaplan, by Robert D. Kaplan, New York City, for Defendants.

*OPINION*

MILTON POLLACK, Senior District Judge.

This case was tried to the Court at a Bench trial. Few witnesses were called to the stand; the remainder of the testimony came from extensive depositions largely taken on behalf of the plaintiff.

The plaintiff also presented at the trial as an aid to the Court pursuant to Rule 702 Fed.Rules of Evidence, a witness versed in statistical analysis, to present what purported to be a statistical age correlation between the various changes in territorial assignments of Provident's branch managers. That witness, of course, had no personal knowledge on the issues; she could only raise questions, not answer them from any actual knowledge of the facts.

This Opinion and the facts found herein, together with its Conclusions, accompany the detailed additional Findings of Fact and the Conclusions of Law set forth separately.

*Overview*

Upon evaluating all the relevant facts and circumstances, including the basic realities which are set forth in detail and in the Findings of Fact and Conclusions of Law, the Court is convinced and so decides that plaintiff failed to sustain his burden of proof by a preponderance of the credible evidence that he was the victim of intentional age discrimination in his employment.

█ The decision of the defendants to split-off the two burgeoning Nassau–Suffolk and Westchester County district offices from the New York Branch Office and to create therefrom a separate branch office, was a reasonable exercise of informed judgment, not based in any part on intentional age discrimination against the plaintiff, and the reason therefor given to the plaintiff was not a false pretext. The credible evidence amply supported the defense that the plaintiff's age had no role in the employment decision involved, and no illegal discriminatory criteria entered into the determination.

*The record*

As evidenced by the record, the senior officers of Provident genuinely believed that the decision to split-off two district offices, with their meager personnel under the former configuration, and restructure them into a full-fledged Branch Office, created in Long Island under branch management and staffing, was conducive to increasing the services and further growth of the business of the two district offices.

The age of the plaintiff (52)—himself domiciled in metropolitan New York City and ultimately averse to moving to Long Island—played no role in this view of the suburban district offices. Provident believed that the growing business in the satellite district offices had outgrown the skeletal district office organizations in those suburban counties, and had reached the point where they were too large to be handled most efficiently out of a metropolitan branch office located in Manhattan. Provident then concluded, after lengthy consideration, that those suburban counties could be serviced more efficiently and effectively by a fully staffed Branch Of-

fice and resident manager located in the suburbs. Defendants' belief was reasonable, reached in good faith and justified under all the facts and circumstances, even in the face of Ellis' excellent record as the New York Branch manager—a factor which could have been and was validly considered by Provident under all the facts and circumstances.

That Ellis believed that the move represented a flawed business judgment is understandable, since it meant to Ellis a contraction of part of his source of incentive compensation. Ellis nonetheless acknowledged Provident's right to change territory and incentive compensation.

"The Court: Did you find anything in the Chandler Papers that gave you an implied contract?

The Witness: Other than what is stated here and the layout of the commission schedules, no, but they did—and they also say, which I agree, they had the right to change it down the road. That they did have a right to do." (R. 246.)

Ellis, acting on his natural disappointment, retaliated by filing this suit under the Age Discrimination in Employment Act (ADEA), while he continued to remain employed as Provident's Branch Manager in the New York office, with his salary remaining untouched and his incentive compensation now stemming from metropolitan New York. In bringing this claim, Ellis expressed his belief that a territory could not become too large for a branch manager like himself to manage effectively—even if it took in the entire United States, he said. (R. 145–46.)

■ It is not the role of this Court to second guess untainted managerial decisions that fall within Provident's full discretion.

The record is replete with evidence that the defendants genuinely believed the business reasons they communicated to the plain-

tiff as explanations for the split. Robert Fowler, the regional manager of the plaintiff's urban and suburban territory, explained in his deposition that the former configuration—in which a broker on Long Island would have to turn in an application for insurance to the Westbury, Long Island district office, which would then have to send it to the Manhattan, New York branch office, which would then enter it into the New York City computer system, send it to the Home Office in Chattanooga, Tenn. for processing, have it sent back to Manhattan, and finally out to Westbury—was highly inefficient, created a significant time constraint, and placed an undue administrative burden on the New York Branch Office. This concept was reinforced by Mr. Christiana, the executive-in-charge, who stated in his deposition that the decision was "market driven ... we felt we could write, over time, more business in that area with those kinds of services." [1] (Dep. at 348.) In contrast to the limitations placed on district offices which had to clear their business through a branch office, Provident's branch offices were staffed differently, and were able to print and issue policies, pay claims, settle controversies, pay commissions and deal directly with the Home Office. (*Id.* at 54.)

Ellis was informed in November, 1990, that management was considering substituting a branch office in Long Island for the district office set-up in the suburbs of New York. He was offered the opportunity to manage the Long Island branch, which he later declined, preferring to remain in Manhattan.

In January, 1991 Provident began negotiating with Eugene McCarthy, Monarch Life Insurance Company's 47–year–old branch office manager, who had become available for employment because his company was in the

---

**1.** Plaintiff contends that the defendants could easily have solved the time lag problem by installing fax machines in the district offices—a suggestion that Ellis allegedly made to management. In his deposition, however, Fowler explained that the branch office needed the actual physical application, rather than a facsimile, before it could forward the forms to Chattanooga. (Fowler Dep. at 62.) In any case, the question before the Court is not the wisdom of defendants'

internal procedures, but rather whether the defendants discriminated against Ellis because of his age. According to Ellis' own testimony, the defendants had a company-wide policy of not providing modems for any of the district offices. (R. 99.) This policy, applied to all the district offices equally, can hardly constitute evidence of pretext regarding the defendants' proffered explanation for its decision to split plaintiff's territory.

midst of the financial difficulties which would soon thereafter land it in bankruptcy proceedings. Provident made an offer which McCarthy estimated would yield approximately $245,000 a year. (R. 427.) McCarthy appeared to be interested in the opportunity and went so far in the next months as selecting an office location in Long Island, discussing furniture and being introduced to district office personnel as the incoming Branch Manager. In about May, 1991 he rejected Provident's offer. Provident then hired one of its own employees, Robert D. Stanilov, who was the district manager of the downtown Manhattan district office. Stanilov had been trained by and had reported to Ellis, and Ellis had stamped him in personnel reviews as qualified and ready for branch management. (R. 191–92.)

### Corroboration

The defendants' intentions and purposes were corroborated (apparently unexpectedly) by Eugene McCarthy, called as a witness on behalf of plaintiff. McCarthy testified that he, like the plaintiff, had been told by management that Provident was creating a new branch office in order to allow more efficient servicing of brokers and their business, (R. 442), and because the suburban territory had become too large for a New York City based branch manager to cover effectively. (R. 448–49.) McCarthy confidently estimated he could produce business in an amount that was well-above the region's past record. He also testified that he believed that Christiana was creating a branch office in Long Island for those reasons. (R. 442.)

### Conclusion

In sum, according to plaintiff's testimony, Ellis' sole claim was that the split of the district offices in the suburbs from the New York Branch Office located in Manhattan, in order to create a new branch, was undertaken with discriminatory age intent. (R. 206–07.)

Having seen and heard the witnesses, observed their demeanor, considered the documentary evidence and the voluminous depositions and the contradictions therein of trial testimony and the necessary inferences and probabilities flowing therefrom, the Court has resolved the issues of credibility in favor of defendants and against the plaintiff and his expert. No statistically significant evidence adduced presented against the totality of the evidence in this record credibly supports an illegal relationship or purpose between the age of defendants' branch managers and the territorial splits that occurred in the Provident branch offices. The credible proof fails to establish that the defendants acted out of intentional age discrimination against Provident's branch office managers from time to time in the decisions to split and upgrade territory.

The foregoing, together with the detailed findings filed herewith, shall constitute the findings of fact, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

### ADDITIONAL FINDINGS OF FACT

1. On December 11, 1991, James Ellis filed a complaint against his employer, the Provident Life & Casualty Insurance Co. and its parent company, the Provident Life & Accident Insurance Company (collectively "Provident"), alleging claims of age discrimination proscribed by the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–33a, and N.Y.Exec.Law § 296.

2. Ellis started working for Provident in 1967 as a sales consultant in Miami, Florida, and Provident assigned him to be New York branch sales office manager in 1972, the position he holds today. (R. 3–4.)[2]

3. The territory that Ellis covered at the time he joined the New York Branch Office was the urban area of Albany South, including Westchester County, Nassau and Suffolk Counties in Long Island and the five boroughs of New York City; the only border that existed was the Hudson River, separating New Jersey from New York State. (R. 16.)

4. The New York branch territory consisted of four offices in 1990: one branch office located at 708 Third Avenue in Manhattan, a Downtown district office located at

---

**2.** (R. ___) refers to the record in this case. (Exh. ___) refers to the exhibits in evidence.

116 John Street in lower Manhattan, a Long Island district office located in Westbury, Long Island, and a Westchester district office located in White Plains. (Exh. 27.)

5. Ellis alleged that he suffered a demotion when Provident split-off from the branch office territory the suburban district offices in Long Island and Westchester and created therefrom a branch office in Long Island on or about July 1, 1991. Ellis alleges that the creation of a branch office in Long Island was because of his age, and that this decision was in furtherance of a pattern and practice of reducing the branch sales office territories of older branch managers by division, closure and forced retirement in order to reduce the amount of incentive compensation realizable by older managers.

6. Provident, founded in 1887, is headquartered in Chattanooga, Tennessee. It sells several lines of insurance policies in New York state and elsewhere through its wholly-owned subsidiary, defendant Provident Life and Casualty Insurance Company, including non-cancelable individual disability income insurance. (R. 4, 14.) Currently, Provident sells individual disability policies nationwide through eight regional sales offices and approximately 40 branch sales offices that report to the regional offices, all of which are managed by Provident employees. (Exh. 13.)

7. Provident's policies are sold to policyholders by independent insurance brokers who represent the insureds. (R. 17, 130.) Thus, Provident's direct customers are the brokers, not the ultimate policyholders. (R. 17, 130.)

8. Provident's individual disability income insurance business grew over the years through the addition, division and creation of new sales offices throughout the country, through an aggressive sales force, and through highly competitive policies. The tremendous growth of the entire industry slowed dramatically in the early to mid-1990's because of enormous claims losses and other losses associated with the business. (R. 53–54; 160–62.) Although Provident still sells non-cancelable disability policies, it has made major changes in its products, operations and management. (R. 160–67.)

9. Ellis testified that over the years, Provident's competitive edge was the superior service its Branch sales office could provide the broker. (R. 28.) Service was the most important marketing and sales tool possessed by a branch manager. (R. 135.)

10. Ellis also testified that the presence of a branch manager in a territory makes a substantial difference in selling and in running the operation. (R. 143–44.)

11. Former department manager John Barnes described having a branch manager in a split territory as being a "significant" advantage. (R. 486.) Having another branch manager in a split territory allows each branch manager to contact directly the producing brokers in his territory. (Id.) Branch managers have the knowledge of how Provident works and the power to facilitate the conduct of business. (Id.) The branch manager could resolve application questions rapidly, and he could unsnarl administrative problems related to commission payment or policy issue. (Id.) The branch manager also had the power to pay claims when claims needed to be paid. (Id.)

12. Provident fueled the growth of its individual disability income insurance line by dividing existing branch offices and creating new branch offices over a period of many years. (R. 482.) Historically, Provident management believed that sales had increased in territories that had been split. (R. 501–02; Christiana Dep. at 36–45.)

13. Provident has no established, written policy addressing how and when to reconfigure existing branch offices or to create new branch offices from existing branch territories. (R. 481–82.) The decision to reconfigure a territory has been based upon the business judgment of the chief officer responsible for designing, selling, and servicing individual disability insurance policies. (R. 482–87, 497–98; Christiana Dep. at 36–45.)

14. Provident divided branch offices for over a decade to create new branch territories, including 15 different divisions of territories from January, 1981 to October, 1991. (Exh. HHHH.)

15. Provident reduced other branch territories by reassigning the business of part of them to an adjacent existing branch for more efficient management on four occasions from 1984 to 1991. (Exh. HHHH.)

16. In addition to creating new branch office territories and reassigning territories to other branch offices, Provident closed branch offices for production and return on equity reasons, including two branch offices in 1991, two more in 1993, and 12 branch offices in 1995. (Exh. HHHH; R. 461–66.)

17. John Barnes was the chief officer in charge of Provident's Individual Disability sales from mid–1986 to the fall of 1989, when he was assigned to other responsibilities. (R. 11, 480.) Ralph Christiana was Barnes' chief marketing officer from April, 1987 to October, 1989, when he replaced Barnes as chief officer. (R. 11–12, 481.) During Barnes' tenure as chief officer, he decided to make the territorial changes in Dallas, Chicago, Cincinnati, and San Francisco. (R. 482–87.)

18. Christiana was chief officer responsible for making decisions or effective recommendations to divide territories from the fall of 1989 through 1993. (R. 10–12, 480; Exh. HHHH; Christiana Dep. at 223.)

19. Richard A. Wolf was responsible for the recommendation to close 12 branch offices in 1995, after the disability business became unprofitable for Provident. (R. 53–55, 473.)

20. Christiana decided to create a new branch office from part of the existing New York branch office territory managed by Ellis some time around October of 1990. (Christiana Dep. at 351–60.) At that time, the New York branch territory was one of the largest of Provident's branch office territories in terms of premiums being collected. (R. 173.)

21. The suburban district office in Westbury, Long Island was Provident's largest district office, and it was larger than most of Provident's branch offices in other cities. (Christiana Dep. at 220–24; R. 173–74.)

22. On November 20, 1990 Christiana told Ellis about his decision to create the Long Island branch office, and that the reason for the split was that the Westbury, Long Island office was too big to be a district office and should really be a stand-alone branch office. (R. 83, 85–94, 239; Christiana Dep. at 220–24; 227–31.) Christiana and Provident's Chief Marketing Officer Gary Erickson believed that the Long Island viz., the Nassau–Suffolk counties, territory had outgrown its district office and that a branch office and the services which a branch office could supply, as contrasted with those of a district office, were needed there. (Christiana Dep. at 220–24; 227–31; 353–60; 362–64; 411.)

23. At least 10 of Provident's competitors in the New York/Long Island area already had separate New York and Long Island branches at the time of Christiana's decision. (R. 150–57, 437.)

24. Ellis understood that Christiana believed there was merit in opening a Long Island branch office. He testified that "I would not think that [Christiana] would put—spin it off as a branch office if he thought the percentage of growth was going to be less than what it was when I had it." (R. 240, 167–68, 175.) Christiana believed sales would grow by opening the branch office in Long Island (R. 175), and he decided that the area assigned to the New York branch office could be more efficiently managed and developed if the Westbury district office was made into a branch office and the White Plains district office assigned to it. (R. 182–83.)

25. Ellis was offered the choice between remaining the New York branch manager, which would consist of New York's five boroughs, including the Downtown Manhattan district office, or becoming the manager of the new Long Island branch territory including the Westchester district office territory. (R. 87, 178–81; Exh. 6.) Ellis initially stated that his choice would be the Long Island position, (Christiana Dep. at 213), but two months later Ellis chose to stay on as the metropolitan New York branch manager, because he needed the cash flow and he did not want to move from Manhattan. (R. 179–81, 236–37.) He made this decision even though he thought the growth potential was greater

on Long Island. (R. 181.) Ellis testified: "When I looked at the operating statements, my income at that time was a little bit more in the New York branch office. Even though the growth potential was more in Long Island, I elected to stay in New York City ... I just didn't want to move to Long Island." (R. 181.)

26. On or about July 1, 1991, when the Long Island branch office was opened, Ellis was 52 years old. (R. 2.)

27. After Christiana made the decision to create a Long Island branch office, and Ellis had chosen to stay as New York branch manager, Provident made a bona fide offer to employ as the Long Island branch manager 48–year–old Eugene McCarthy, the Monarch Life Insurance Company branch manager for New York, and one of Ellis's chief competitors. (R. 418, 424–25, 437; Exh. 8.) McCarthy estimated that the offer would yield him $245,000 per year. (R. 427.) McCarthy was interested in exploring employment with Provident because Monarch was in financial difficulty. (R. 419, 438–39.)

28. McCarthy's position with Monarch was similar to that of Ellis with Provident, but did not include Monarch's Long Island branch. (R. 415–16.)

29. Christiana thought that McCarthy could bring his brokers and a substantial amount of business to Provident, and that his departure would be a "crushing blow" to Monarch that would destroy its New York operations. (R. 118, 430.) Christiana told McCarthy that he thought hiring McCarthy away from Monarch would be a "coup." (R. 451.)

30. Christiana told McCarthy that: "The Provident lacks presence in New York," and that brokers could be better serviced by splitting up the territory and having an additional branch office covering the Westchester and Long Island territories in place of the existing district offices. (R. 442.) Christiana, Erickson and Regional Director Rob Fowler told McCarthy that Provident's current New York territory, which included Nassau and Suffolk, was too large for one manager to cover effectively, because it could not provide enough service to the brokers out in Suffolk and Nassau in order to promote new business effectively. (R. 448–49.)

31. McCarthy told Erickson and Fowler that he believed he could sell three million dollars in premiums on Long Island, which had accounted for $1.7 million in sales in the year before the split. (R. 445–46; Exh. BBBB.) McCarthy believed that his presence as the Long Island branch manager would make a substantial difference in the sales for that region. (R. 445–46.) Fowler and Erickson expressed enthusiasm to McCarthy about the growth potential on Long Island. (R. 442.)

32. Ellis admitted that McCarthy was a "very good branch manager," (R. 159), and that McCarthy was qualified to do the job. (R. 221.)

33. Provident believed that McCarthy would accept its offer, and McCarthy acted as if he had accepted the offer by touring Long Island with a representative of the home office, to assist him in picking a new office location and new office furniture. (R. 117, 251, 269, 449.) Also, McCarthy met with some of Provident's employees assigned to the Nassau–Suffolk and Westchester district offices, and he permitted himself to be introduced as the new branch manager. (R. 450.) It appeared to Ellis that McCarthy had accepted the job. (R. 221.) McCarthy had dinner with Christiana in late April, 1991, where they discussed the Long Island job. (R. 425, 439–40, 451.) Christiana expected that McCarthy would accept the job at that meeting. (R. 440.) Erickson and Fowler both believed McCarthy had accepted the job. (R. 220–21.)

34. However, in May, 1991, McCarthy telephoned Fowler and advised him, Christiana and Erickson by conference call that he was not going to take the job. (R. 434.) McCarthy was troubled by the fact that a new compensation plan was in the offing, and its details were not as yet known. (R. 426–27.) McCarthy also indicated that he wanted more money, health insurance coverage for his former wife, a more expensive car to drive and individual disability coverage which he had had with Monarch, all of which Provident refused. (R. 431–34.) Provident's subsequent efforts to persuade McCarthy into

accepting the job were unsuccessful. (R. 452–3.)

35. Thereafter, Provident offered the new Long Island branch manager position to Robert Stanilov, the downtown Manhattan district office manager who had been trained and was favorably looked upon by Ellis as ready for a branch managership. (R. 191.) Stanilov was 35 years old when he accepted the offer. (R. 24; Stanilov Dep. at 4, 34.) Ellis thought Stanilov was qualified to be the Long Island branch manager, and Ellis would have recommended Stanilov for the job, were he asked. (R. 168–69, 191–92.)

36. Ellis made recommendations for the new branch managership which did not include Ray Cordes, the existing district manager. (R. 191–93.)

37. Provident had memorialized the terms under which branch office managers serve the company in a written policy statement issued by Accident Department Manager Brooks Chandler in December, 1972 ("Chandler Papers"). (Exh. A.) Pursuant to this status and policy statement, Provident paid branch managers a base salary, which was a function of the number of years the branch manager held that position, plus incentive compensation if the revenues of their offices exceeded certain costs of operating the office. (R. 38–39, 42–44.) Revenues were calculated by crediting to the branch office's operating statement a certain percentage of the paid premium which were known as allowances. (Exh. A.) Certain office expenses, such as the fixed salaries of the branch manager and his employees, bonuses for his consultants, office rent, and automobile expenses, were debited from the branch office's operating statement. (R. 32, 38.) If the debits exceeded the credits on the operating statement, Provident assumed that loss as an additional operating cost of the branch office and considered the office to be in the "red." (R. 42–44, 59.) When the branch office credits exceeded debits, it was considered to be in the "black," and the positive balance on the operating statement was paid quarterly to the manager as incentive compensation in addition to his guaranteed base salary. (R. 31–40, 59.) These expense allowances were used in part to build up the so-called "book of business" of the branch, really a customer list of Provident's broker-customers.

38. Under this system, defendant's calculations show that Ellis's total paid income was $579,423 in 1989, declined to $514,077 in 1990, then grew to $617,402 in 1991, declined to $434,632 in 1992, increased to $466,261 in 1993, and declined to $394,196 in 1994.

39. The Chandler Papers told the branch managers, among other things that:

Managers of Accident Department Branch Offices are salaried employees of the Company and as such are eligible for all benefits available to field salaried employees, including the pension plan, sick-leave plan, group insurance and other benefit programs provided by the Company. As in the case of other employees, the Company may at its discretion determine the Manager's location and assignment of duties and responsibilities as well as reassign, transfer or promote him, or terminate his employment . . .

\* \* \* \* \* \*

In the event of termination of employment, death or retirement of the Manager, any credit balance in the statement at the end of the calendar month in which the occurrence takes place will be paid to the Manager or to his estate . . .

\* \* \* \* \* \*

This explanation of the current Company policy with respect to Branch Office operations and compensation of Branch Office Managers is not a contract and does not constitute a guarantee of continued employment. The Company may, at its option, revise any or all of the provisions and conditions set out herein.

The Company may discontinue the incentive compensation program with respect to any Manager and cease payment of additional compensation if the manager fails to satisfy production goals established by the Company or to operate the office in accordance with the Company's standards. (Exh. A.)

40. According to longstanding policy, when a branch manager left a branch office

or no longer managed a territory, either voluntarily or involuntarily, Provident no longer paid incentive compensation based on allowances and costs for that territory. (R. 71–72, 325–27.) A new branch manager taking over the servicing of existing policies of a district office received designated compensation for the tasks. Provident credited the operating statement of the newly assigned manager of the territory with two percent of the premium paid on the existing policies to service these policies and promote their renewal. (R. 326.) The balance of the premiums collected were retained by Provident. (R. 326.)

41. After Ellis no longer managed the Nassau–Suffolk/Westchester territory and its district offices, in conformity with Provident's policy, Provident did not credit either the New York branch office statements or the Long Island branch office operating statements with "allowances" on policies newly sold or renewed in the New Long Island branch territory. (R. 326.)

42. Nonetheless, it was Provident's long-standing practice to give additional financial support to branch managers when branch offices were divided while they rebuilt their base of premiums credited to these operating statements in their reconfigured territories, upon which incentive compensation was partly based. (Christiana Dep. at 290–99.) The amounts of the transition support credits were selected by each chief officer based on factors he considered important. (*Id.;* R. 514–15.) There was no set formula or policy governing of such supplemental credits. (*Id.*)

43. On July 19, 1991, Provident told Ellis it would voluntarily credit his operating statement with an additional $347,612, over the next five calendar quarters, to assist in offsetting possible lost incentive compensation he might have earned from the territory thereafter managed by the newly-created Long Island branch office while he built up his incentive compensation base in the reduced New York branch office territory. (Exh. GG.) Had he accepted, Ellis would have had credited to his operating statement an additional $57,936 in October of 1991; $86,903 in January of 1992; $86,903 in April

of 1992; $86,903 in July of 1992; and $28,967 in October of 1992, and his incentive pay would have increased by these amounts. (Exh. HH.) Ellis, on the advice of his attorney, rejected such supplemental credits by letter. (R. 122–23.) He was at that time pursuing the notion of a claim against his employer under the EEOC and the ADEA, both prepared by his attorney.

44. Ellis never spoke with Christiana, Fowler, or Erickson after he rejected the supplemental credit. (R. 219–20.)

45. Effective January 1, 1992, Provident, as it was privileged to do, materially changed its incentive compensation plan for branch managers. (R. 202–03.) Provident again completely changed the incentive compensation plan effective January 1, 1994. (R. 203.) The 1994 plan eliminated the branch office operating statement and incentive pay based on the difference between allowances and costs attributable to the branch office. (*Id.*)

46. Many lawful factors impacted both positively and negatively upon Ellis's income after the territory was divided, including reducing his expenses by lowering the rent, closing the Downtown Manhattan district office, a worsening economy, a significant downturn in the industry, changes in the design, marketing, and pricing of policies, the modification of the incentive compensation plan effective January 1, 1992, and the radical change in the incentive compensation plan effective January 1, 1994 that eliminated premiums on renewal of policies as a factor in calculating incentive compensation and other variables.

47. Neither Christiana nor Erickson nor Fowler ever made any reference to Ellis about his age, (R. 183–84), and plaintiff does not claim otherwise.

48. Stray comments gathered from a miscellany of individuals relied upon by Ellis do not refer to decision-makers in the decision to split-off the suburban territories, and certainly do not reflect any age animus in connection with the upgrading of the New York suburban district offices to a branch sales office. (Exhs. 20, 22, 23, 24, 25; Baker Dep. at 38, 44; Bauman Dep. at 68; Storey Dep. at 186–87.)

49. Ellis is still employed as Provident's New York branch manager, and he is being paid .at the same guaranteed salary he formerly received, to which appropriate incentive compensation was added when it became due. (R. 222.) He is Provident's highest paid branch manager. (R. 198.)

50. The articulated reason of Provident for the split was credibly established as being a genuine business reason and motive in the exercise of informed honest business judgment for the best business interests of Provident and was not a false pretext to hide an illegal motivation. Ellis did not establish by a preponderance of the credible evidence that he was intentionally discriminated against in violation of 29 U.S.C. § 623(a) and N.Y.Exec. Law § 296(1) "because of his age" by the split-off of the Nassau–Suffolk and Westchester district offices. No credible evidence was adduced of discrimination against Ellis by reason of his age or of a pattern and practice of Provident to reduce territories of its older branch managers by division, closure or forced retirement to reduce or otherwise compromise their incentive compensation. Ellis denied knowledge of the reasons and purposes for earlier territorial changes of other branch offices. (R. 204–06.)

51. Ellis alleged in his complaint, but did not establish by competent credible proof that Provident engaged in a "pattern and practice" of intentional age discrimination "by substantially reducing the size of the older branch managers' sales territories, and, in some instances, closing its offices in their territories." (Complaint, ¶¶ 37, 38.) In an attempt to support the alleged pattern and practice, plaintiff's expert, Gail N. Janowitz, a statistician, .purported to analyze branch office splits and closures from May 1, 1988 through 1992, as well as "forced retirements" of branch managers, and formulated statistical opinions. Cross-examination contradicted and disposed of her insufficient samples, methods and theories.

52. To the extent any of Janowitz's analyses had any validity, her key regression analysis showed her that there was no statistically. significant correlation between changes in age and territorial reductions. (R. 528–30.) She informed Ellis' counsel of this finding, but thereafter excluded and suppressed this finding from the report that she delivered to defendants. (Exh. SSS; R. 529–31.) Janowitz also acknowledged that none of her tests purport to determine whether the split-off of the suburbs in the New York branch was caused by age discrimination. (R. 298–99.)

53. Janowitz picked arbitrary compensation and age levels to .define subclasses to reach her results. Although she examined other data, ultimately, only branch managers aged .50 and over who were managers of territories in the "black" (meeting their expenses) were considered in reaching her conclusion (based on her inadequate samples) that there was a statistically significant relationship between the age of branch managers and the split of their territories. (R. 298, 523, 540–43). This witness, presented under Rule 702 to assist the Court to understand the evidence, exhibited flawed analyses, insufficient samples from which to establish custom and illegal purpose to violate age discrimination law, tended to equivocate and quibble when parts of her testimony were challenged, was of questionable assistance to the Court at significant points of her testimony and resulted in the Court's finding made in the accompanying Opinion hereon to resolve her credibility in favor of the defendants on her part of the trial.

### CONCLUSIONS OF LAW

1. Ellis did not establish by a preponderance of the credible evidence or by any credible testimony which he presented at the trial that he was intentionally discriminated .against in violation of 29 U.S.C. § 623(a) and N.Y.Exec.Law § 296(1) "because of" his age when the New York branch territory was divided and a new branch was established from the Long Island and Westchester district office territories he formerly managed.[3]

---

3. As New York courts have consistently looked to federal case law in interpreting the Human Rights Law, this Court will interpret the state claims under ADEA standards. *See, e.g., Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1182 (2d Cir.1992).

**2.** Regardless of the method of proof used, at all times Ellis retained the ultimate burden of proving by a preponderance of the evidence that he was the victim of intentional age discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609–11, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Cabrera v. Jakabovitz,* 24 F.3d 372, 382 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181, 1185 (2d Cir.1992) *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

**3.** Provident articulated a legitimate and truthful business reason for establishing a new branch office on Long Island out of the suburban district offices in the New York branch office territory. Provident's competitors had separate branch offices in both New York and Long Island before Provident created its own Long Island branch office, and there was good reason for Christiana to believe that splitting the district offices in that suburban area from the New York branch office territory would be beneficial. Ellis admitted that Christiana believed that the Long Island district office, which was larger than most Provident branch offices, had outgrown the district office system and that Christiana assumed sales would increase because of the split. The presence of a branch manager in a given territory was a significant factor in increasing the growth of sales in such territory.

**4.** The credible evidence did not establish that Provident's articulated reason for its actions was a false pretext to cover up an illegal motive to intentionally discriminate against Ellis because of his age.

**5.** Provident created the Long Island branch office to provide for more concentrated management and branch office services in the territory and not to reduce Ellis's compensation, although Provident was privileged, if it so chose, to reduce Ellis' compensation

for reasons other than his age. As stated by the Second Circuit:

> ... *We have stated that "nothing in the ADEA ... prohibits an employer from making employment decisions that relate an employee's salary to ... the responsibilities entailed in particular positions and concluding that a particular employee's salary is too high."* Bay, 936 F.2d at 11. SwissRe was not required to continue [plaintiff] in a salary that was not commensurate with his responsibilities simply because he was over forty.

*DiCola v. SwissRe Holding (North America), Inc.,* 996 F.2d 30, 33 (2d Cir.1993) (emphasis added). Later, the Second Circuit stated:

> The ADEA does not prohibit an employer from acting out of concern for excessive costs, even if they arise from age-related facts—such as that employees with long seniority command a higher salary and benefits expensive [sic] than new hires. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609–13, 113 S.Ct. 1701, 1706–07, 123 L.Ed.2d 338 (1993).

*Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 n. 2 (2d Cir.1994). *See also Allen v. Diebold, Inc.,* 33 F.3d 674, 677 (6th Cir.1994); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1126 (7th Cir.1994); *Thomure v. Phillips Furniture Co.,* 30 F.3d 1020, 1024 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1255, 131 L.Ed.2d 135 (1995); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 66 EPD ¶ 43,600 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996) ("the ADEA does not prohibit discrimination on the basis of salary or seniority.")

**6.** Janowitz' study did not establish that Ellis' territory had been split because of his age. Statistics alone may indicate, but rarely sufficiently prove, without supporting proof, discriminatory motive, a necessary element of Ellis's claim of disparate treatment. *Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977) ("Proof of discriminatory motive" is critical [in a disparate treatment case] ); Larson, 2 *Employment Discrimination,* p. 10–131 (1991) ("[A]n individual plain-

tiff alleging disparate treatment cannot rely on statistics as the keystone to his prima facie case.") Moreover, the Supreme Court stated in *Teamsters* that the statistical evidence must show *"longstanding* and *gross* disparity":

> We have repeatedly approved the use of statistical proof, *where it reached proportions comparable to those in this case,* to establish a prima facie case of racial discrimination in jury selection cases. [Citations omitted.] Statistics are equally competent in proving employment discrimination.... Evidence of *long standing and gross disparity* between the composition of a work force and that of the general population thus *may* be significant....

*Teamsters,* 431 U.S. at 339, and 339–40 n. 20, 97 S.Ct. at 1856, and 1856–57 n. 20 (emphasis added); *Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) ("... *gross* statistical disparities ... *may* in a proper case constitute prima facie proof....") (emphasis added). Janowitz's analysis fails sufficiently to raise an inference of age discrimination against Ellis because it fails these tests. The requisite supporting proof was not adduced or credibly shown by the plaintiff.

7. Ellis' alleged "demotion" did not occur in circumstances giving rise to an inference of age discrimination. It is undisputed that Provident offered the Long Island branch manager position to Eugene McCarthy, a member of the protected class, five years younger than Ellis. The Supreme Court has recently stated: "In the age-discrimination context, such an inference [of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consolidated Coin Caterers Corp.,* — U.S. —, —, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). The bona fide job offer to McCarthy negates an inference that Provident intended to discriminate against Ellis because of his age by by the split-off of the suburbs in his territory.

8. The stray comments cited by plaintiff in their submission were unrelated to any question of age animus in connection with the upgrading of the New York suburban district offices to a branch sales office. Inferences of intentional discrimination may not be based on "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself ..." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989).

9. Considering all the admissible, relevant, and probative evidence, the Court concludes that Mr. Ellis has not met his burden of proving by a fair preponderance of the credible evidence that because of his age his territory was divided or that Provident otherwise took intentional age discriminatory action against him or any others in their employ.

Judgment is for Defendants, and costs are awarded to Defendants.

SO ORDERED.