James R. ELLIS, Plaintiff,

v.

PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY and Provident Life & Casualty Insurance Company, Defendants.

No. 96 Civ. 2484(MP).

United States District Court, S.D. New York.

April 20, 1998.

---

Liddle & Robinson, L.L.P. (James A. Batson, of counsel), New York City, for plaintiff.

Paul, Hastings, Janofsky & Walker (Patrick W. Shea, of counsel), New York City, for defendants.

## OPINION AND DECISION

POLLACK, Senior District Judge.

This action represents the second chapter in an ongoing dispute between plaintiff James R. Ellis ("Ellis") and his employers, Provident Life and Accident Co. and Provident Life & Casualty Insurance Co. (collectively "Provident"). Ellis was employed as a Branch Manager of Provident's New York Branch Office from 1972 until 1996, when he voluntarily retired. In *Ellis v. Provident Life & Acc. Ins. Co.*, 926 F.Supp. 417 (S.D.N.Y.1996) ("*Ellis 1*"), this Court held that Provident's decision in 1991 to split off district offices from the New York Branch Office to create therefrom a separate branch office was a reasonable exercise of informed judgment and was not pretext for discrimination; and therefore, Ellis did not establish age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–33a, and N.Y.Exec.Law § 296.

Ellis brings this second suit ("*Ellis 2*") arising out of Provident's decision, implemented in January 1994, to overhaul its incentive compensation system and cease paying Branch Managers commissions on renewal premiums. The Complaint initially presented seven claims, but Ellis has withdrawn and no longer asserts two state age discrimination claims.[1] The remaining claims hinge on Ellis' assertion that renewal commissions were vested and that Provident's 1994 overhaul of their incentive compensation plan breached an implied-in-fact contract which required payment of these vested renewal commissions on the New York Branch Office Territory block of in-force business as of December 31, 1993. In addition to the implied-in-fact contract claim, Ellis has asserted his right to payment for lost renewal commissions on theories of promissory estoppel, negligent misrepresentation, unjust enrichment, constructive trust, and improper withholding of wages.

Provident has moved for summary judgment with respect to each of Ellis' claims. Ellis has cross-moved for summary judgment with respect to his implied-in-fact contract claim.

For the reasons cited below, Provident's motion for summary judgment is granted and Ellis' cross-motion is denied.

## BACKGROUND

### The Employment Relationship

Plaintiff James R. Ellis, was employed as a Branch Manager for Provident's branch office located in New York City, from 1972 until he voluntarily retired at the end of 1996. During his entire employment, plaintiff had no written contract and was an employee "at will." Provident sells its individual insurance policies through independent brokers. Plaintiff's job as Branch Manager was to facilitate such sales by recruiting, assisting and servicing brokers.

Ellis received a base salary, plus incentive compensation if the revenues credited to his office on the branch's operating statement exceeded certain designated costs of operating his office. The revenues credited to the office included a percentage of premium earned by Provident for new and *renewed*

---

**1.** Ellis expressly on the Record, in open Court on his motion, withdrew and *no longer* asserts the discrimination claims in VI and VII.

*policies produced by the Branch Manager.* These credits were referred to by the parties as overwriting credits or allowances. Certain expenses, including the salary of the Branch Manager and certain of his employees, bonuses for consultants and rent and automobile expense, were then debited from the operating statement, and any positive balance was paid to the Branch Manager as incentive compensation.

A policy statement in writing was issued in December 1972 by the then head of the Accident Department, Brooks Chandler and that governed plaintiff's employment (hereafter the "Chandler Papers"). The Chandler Papers expressly provided that:

> "Managers of Accident Department Branch Offices are salaried employees of the Company and as such are eligible for all benefits available to field salaried employees, including the pension plan, sick-leave plan, group insurance, and other benefit programs provided by the Company. As in the case of other employees, the Company may at its discretion determine the Manager's location and assignment of duties and responsibilities as well as reassign, transfer or promote him, or terminate his employment."
>
> \* \* \* \* \* \*
>
> "This explanation of the current Company policy with respect to Branch Office Managers *is not a contract and does not constitute a guarantee of continued employment. The Company may, at its option, revise any or all of the provisions and conditions set out herein.*"

Thus, when the plaintiff's New York City territory was split in 1991, and Westchester, Nassau and Suffolk counties, the New York suburban areas were split-off from the previously combined New York City Metropolitan and suburban areas, Ellis no longer was entitled to commissions on renewals of policies written for the suburban areas and he does not claim that he is; Ellis makes no claim herein against renewals which were made in the suburban areas of New York; he no longer was in charge of that territory. Commissions on renewals of those policies in force before the split fell in part to the new branch manager for the suburban New York

areas and the balance reverted to Provident. The territorial split of the New York area involved was litigated in *Ellis 1* and was upheld against the claim of Ellis that the split discriminated against plaintiff on the basis of his age. No age bias claim exists any longer in *Ellis 2.*

Acting consistently with the Chandler Papers, there have been, over the years a number of changes to Provident's compensation system, including that of January 1, 1994 on which plaintiff rests.

*The 1994 Changes to the Incentive Compensation System*

In January 1994, Provident implemented several changes in the incentive compensation system. Of note, base compensation was calculated exclusively on the percentage of new premium received in a policy's first year; renewal premiums on old policies no longer generated overwrites in calculating incentive compensation.

In *Ellis 1*, plaintiff gave the following testimony:

> "Q: No. I asked you if the Chandler Papers made clear to you and you understood that the Chandler Papers said that the company reserved the right to change the compensation plan at whim.
>
> A: Yes [4/15/96 Trial transcript of Ellis 1, at p. 201, lines 1–5.]
>
> Q: In fact, the company on a number of occasions has changed the incentive compensation plan, including the number of overwrites which were allotted to branch managers, which you said occurred back in the 1970's?
>
> A: I think it was in 1985, 1986.
>
> Q: ... they did make a change ... that reduced the percentage?
>
> A: Yes ... they have a right to change.
>
> Q: They changed it in their discretion January 1, 1992?
>
> A: Yes.
>
> Q: And they changed it again at their discretion effective January 1, 1994?

A: Yes. [Trial Transcript of Ellis 1 at p. 202–03].

\* \* \* \* \* \*

Q: The Court: Did you find anything in the Chandler Papers that gave you an implied contract?

The Witness: Other than what is stated here and the layout of the commission schedules, no, but they did—and they also say, which I agree, they had the right to change it down the road. That they did have a right to do". 926 F.Supp. at 417.

### The phantom implied-in-fact contract

To offset the clear understanding of Ellis from the foregoing, he claims to have obtained an "implied" contract as a result of the following verbal assurances and Provident's practice to buy-out territorial changes which he says furnished him where there was no elimination of part or all of a branch manager's territory with a "vested" contractual right to commissions on renewals of insurance originally written prior to the incentive compensation overhaul effective January 1, 1994.

The history, most favorably stated for the plaintiff's phantom contract was as follows:

Plaintiff states:

"The Chandler Papers had created a distinction between branch managers who were not under contract and general agents, who were under written contract with Provident." As plaintiff's brief hereon correctly states: "General agents had a 'vested' interest [in writing] in renewal commissions generated by their business for ten years if their contracts were terminated. A general agent therefore had a 'claim on the stream of commission payments and overwrites' that would accrue during the future ten years." [The amount was determined by a 'vested commission evaluation' computer program, which calculated the present value of these future renewal commissions.]

Plaintiff's statement in his brief continues: "By contrast, under the Chandler Papers, a Branch Manager's renewal commissions were paid only as long as he remained in charge of his territory. If the manager was terminated or transferred, or if the territory was split, the annual incentive compensation (net allowances) reverted to Provident."

Plaintiff's testimony in *Ellis I* was that:

"Q: '... the company reserved the right to change the compensation plan at whim?

A: Yes.

Q: You acknowledge, do you not, that the Chandler Papers spelled out in detail that you were an employee at will, and that you had no contract or rights or incentive pay under the system that the Chandler Papers promoted?

A: As long as it does not discriminate under federal laws, yes.

Q: And in 1994, the company completely eliminated the operating statement itself and any incentive paid based on the difference between overwrites and expense credits that were assigned to the operating statement.

The Court: That was permissible under the plan that privilege that the company had which you just acknowledged?

The Witness: Yes.

The Court: It was the plan?

The Witness: Yes, they had the right to change that.

The Court: did you find anything in the Chandler Papers that gave you an implied contract?

The Witness: Other than what is stated here and the layout of the commission schedules, no, but they did—and they also say, which I agree, they had the right to change it down the road. That they did have a right to do."

The next attempt by plaintiff at constructing a vested implied right to commissions on renewals is argued as follows:

It is undisputed that under the Chandler Papers, a branch manager's renewal commissions were paid only as long as he remained in charge of his territory. If the manager was terminated or transferred, or if the terri-

tory was split, the net allowances reverted to Provident.

In contrast, General Agents employed by Provident had written contracts and were characterized as independent contractors. General Agents were paid commissions based on a percentage of premiums earned by Provident for both new and renewed policies. General Agents paid their own expenses from this revenue. Unlike Branch Managers, General Agents had a contractually vested interest in renewal commissions generated by their business for ten years if their contract was terminated. That amount was determined by a formula, a vested commission evaluation, which calculated the net present value of these future commissions.

Plaintiff claims that there was an obvious inequity in the disparity of treatment between the contract general agents and the *at will* branch managers. Plaintiff says this was eliminated by defendants in 1980 by instituting not by agreement or any writing but by implication from conduct, namely, a practice of treating branch managers 'just like general agents'; Provident extended the general agents' vesting to its branch managers by "buying" them out whenever it assumed their territory.

In the decade which followed, Plaintiff contends that Provident's vested commission evaluation program for general agents was routinely utilized when a branch manager's territory was taken over by Provident. Each buy out took place allegedly outside the context of the Chandler Papers, which were essentially silent on the point.

However, this treatment is entirely irrelevant here since the 1994 change in compensation here being considered did not involve any territorial buy out of any part of Ellis' New York City territory; there was no split at that time of Ellis territory; that continued intact until he retired voluntarily in 1996; and plaintiff disclaims any implied contractual right as a result of the earlier division of the New York City territory in 1991, litigated in *Ellis 1*.

*Promises to Branch Managers as basis for an implied contract to pay commissions on renewals after January 1, 1994.*

In 1985 or 1986, David Fridl the Accident Departments Chief Officer in response to expressions of concern by Senior Branch Managers over security, put their fears to rest by telling them repeatedly they could rely upon the continuation of the buy-out practice whenever territory was taken from the Branch Manager. Fridl discussed a formula for the buy outs at a meeting, and Ellis may have been at the meeting. Fridl told Ellis "don't worry about it" if Provident takes over some of your territory. Fridl thereby implied and stated to him that Ellis in some form "owned his New York territory; '[t]his is your city'" or "this is all yours" (referring to the New York territory.)

John Barnes succeeded Fridl as Chief Officer in 1986 and continued the practice of paying branch managers for the blocks of business created during their managership when their territories were changed or assumed. Barnes used an evaluation program to compensate general agents in modified form of the "vested" commission paid to general agents. For example, in 1987, Barnes split the Chicago branch manager's office and for the transfer of the business a payout to the former branch manager was the "present value of overwrites" and "present value of commissions as calculated to value general agents' territories, with certain modifications."

A member of Barnes staff, Sylar, drafted a valuation guideline for territorial assumption by the Company which he described as an "unpublished supplement to the Chandler Papers to channel future similar situations as they may occur." When Barnes split the San Francisco office in 1989, he again bought out the branch manager using the vested evaluation program and the Sylar guidelines.

However, as already stated, no buy-out of territory accompanied the January 1, 1994 overhaul of the incentive compensation system nor did branch managers have a written contract therefor.

Another attempt by plaintiff to create an implied vested contract by conduct, for commissions on renewals, is allegedly supported by a meeting with a representative, James Deach of a consulting firm, Towers Perrin,

convened to discuss possible changes in the incentive compensation plan for branch managers. Beyond discussions, nothing objective emerged from the discussions beyond questions of how long should the branch manager own the business.

Finally, to hoist himself into a vested implied contract, for payment of renewal commissions, Plaintiff says "while the precise method of calculating the values of the various blocks of business assumed by Provident during this decade many have varied from buy out to buy out, those methods were mere variations on a single consistent theme—the treatment of renewal commissions as vested."

As already indicated, the "overhaul" in 1994 which eliminated commissions on renewals, is posited semantically on an alleged obligation to compensate plaintiff for the value of his in-force policies and payment of renewal commissions thereon as of the date of the change in the compensation system.

*Discussion*

The key which has locked the door against the claims in *Ellis 2* is the collateral estoppel effect of *Ellis 1* and, particularly, the New York Statute of Frauds. The so-called "vested interest" which plaintiff seeks to derive from the vague verbal assurances cited and a company practice to "buy out" a branch manager's loss of territory, absent a written contract to perform either, is a mirage and does not yield an enforceable interest herein—particularly so since plaintiff lost no territory by the 1994 compensation overhaul which was dictated by disastrous business and economic pressures in the disability insurance industry and mandated the overhaul.[2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the Court's "responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). Summary judgment is also required "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion ..." and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Where the motion is based upon the non-movant's lack of evidence, the movant's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. If the movant satisfies this initial burden, the burden shifts to the non-movant who must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice "to overcome a motion for summary judgment." *Knight,* 804 F.2d at 12. In demonstrating that the factual issue in dispute is "genuine," the nonmoving party must offer evidence to allow a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Provident moves for summary judgment with respect to all of the remaining claims asserted by Ellis. Ellis cross-moves for summary judgment on his implied-in-fact contract claim. "[W]hen both sides move for summary judgment, neither side is barred

---

**2.** The revision of employees compensation was nonetheless palliated to a substantial degree. Provident adopted a bridge that phased in the 1994 Plan over a four year period of time for branch managers. Pursuant to the bridge, Ellis earned total compensation of $394,196, in 1994; $378,051.91 in 1995; and $220,288.51 in 1996. Ellis was the second highest paid Branch Manager in 1994 and 1995 and the highest in 1996. (Hickerson Aff. Pltff 10–12)

from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993). The court "must consider each motion independently of the other, must in each instance view the facts and draw. all reasonable inferences in favor of the non-moving party, and is not required to grant summary judgment for either side." *A. Brod, Inc. v. SK&I Co., LLC*, 1998 WL 119644, *5 (S.D.N.Y.1998).

*Ellis' Motion for Summary Judgment*

Ellis argues, on the basis of *Eskra v. Provident Life and Accident Ins. Co.*, 125 F.3d 1406 (11th Cir.1997), that Provident is collaterally estopped from denying that it breached an implied-in-fact contract vesting Ellis' right to payments on renewal commissions when it revised its incentive compensation plan in January 1994. In *Eskra*, a branch manager sued for lost renewal commissions under the ADEA and Florida contract law after his Miami branch office territory was divided by Provident. The Eleventh Circuit affirmed a jury finding in favor of Eskra, noting that the evidence in that case was sufficient for the jury to find that an implied-in-fact contract to receive lost renewal commissions in the event of a division of Eskra's branch office territory was created. *Eskra*, 125 F.3d at 1414.

 Ellis' reliance on *Eskra* is misplaced. The doctrine of collateral estoppel "bars a party from relitigating in a subsequent proceeding an issue clearly raised in [a] prior proceeding and decided against that party ..." *Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir.1996) (internal quotations omitted); *see also Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) ("[o]nce a matter has been has been litigated and decided, a party may be foreclosed from litigating the same issue again."). Under New York law, two elements must be satisfied before a party can invoke collateral estoppel:

> "[First], [t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and second, there must have· been a full · and fair opportunity to contest the decision now said to be controlling."

*Schwartz v. Public Adm'r of Bronx County*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969).

 Unlike the branch manager in *Eskra*, Ellis has not asserted any implied contractual right to receive renewal commissions based upon the division of his branch territory. Instead, Ellis' claim is that Provident breached an implied-in-fact contract when, in January 1994, it restructured its compensation plan so as to eliminate compensation for branch managers based on renewal commissions. Even if this Court were to assume, *arguendo*, that *Eskra* collaterally estops Provident from denying that an implied-in-fact contract which vests branch managers' right to receive payments · for lost renewal commissions in the event of a division of their branch territory,[3] *Eskra* does not indicate a

---

3. Despite *Eskra*, Ellis is precluded from claiming that there is an implied-in-fact contract that vests a right in Ellis to receive commissions on renewal premiums lost as a result of Provident's division of his New York branch territory. In *Ellis I*, this Court found the following:

> [I]t was Provident's longstanding practice to give additional financial support to branch managers when branch offices were divided while they rebuilt their base of premiums credited to these operating statements in their reconfigured territories, upon which incentive compensation was partly based. *The amounts of transition support credits were selected by each officer based on factors he considered important. There was no set formula or policy governing of such supplemental credits.*

*Ellis I*, 926 F.Supp. at 425 ¶ 42 (emphasis added).

The undisputed facts demonstrate that payments made by Provident to branch mangers when Provident divided their respective territories were variable. In fact, these "buy outs" diminished over time. For example, Mr. Barnes, who succeeded Mr. Fridl as head of Provident's Accident Department, used a formula based on a vested commission analysis used for general agents, but subjected the amounts to an additional 20% discount. Mr. Barnes testified that he used this formula only twice and that it was not binding ·on his successor. Mr. Christiana, who succeeded Mr. Barnes, used a formula that further reduced the payments, initially paying branch managers for six calender quarters of lost incentive compensation and then reducing this amount to four calender quarters.

*Eskra*, decided in a different forum, applying different law to a different set of facts has no

blanket promise to all branch managers that these renewal commissions are vested for all purposes. That these two promises are very different is evidenced by the Record: for example, it is undisputed that incentive compensation was never paid out to branch managers when they were terminated or when branch managers retired. In short, Ellis has not identified an issue decided in *Eskra* which is decisive of the present action. Accordingly, Ellis' Motion for Summary Judgment on the basis of *Eskra* is denied.

*Provident's Motion for Summary Judgment*

Provident asserts two independent bases for its Motion for Summary Judgment. Each are addressed below.

A. Collateral Estoppel

■ In *Ellis 1*, this Court made the following finding of fact:

> Effective January 1, 1992, Provident, *as it was privileged to do*, materially changed its incentive compensation plan for branch managers. Provident again completely changed its incentive compensation plan effective January 1, 1994. The 1994 plan eliminated the branch office operating statement and incentive pay based on the difference between allowances and costs attributable to the branch office.

*Ellis v. Provident Life & Acc. Ins. Co.*, 926 F.Supp. 417 ¶ 45 (S.D.N.Y.1996) (emphasis added). Provident asserts that *Ellis 1* collaterally estops Ellis from arguing that he has a vested right to earn incentive compensation on renewal commissions lost as a result of the 1994 change in the incentive compensation system. This Court agrees.

The findings in *Ellis 1* satisfy the first prong of collateral estoppel that an issue has "necessarily been decided in the prior action and is decisive in the present action." The Second Circuit has observed that "preclusive effect may be given to issues actually and fully litigated, although not technically necessary to the prior court's judgment." *Murphy v. Gallagher*, 761 F.2d 878, 882 (2d Cir.

1985). Although *Ellis 1* concerned Ellis' claim under the ADEA, the issue of whether Provident breached a contract with Ellis when it altered its incentive compensation system was an important aspect of *Ellis 1*. Courts have held that an employer's departure from regular procedures, including contractual requirements, may "bolster a claim of illegal discrimination." *Hawkins v. Astor Home For Children*, 1998 WL 142134, *7 (S.D.N.Y.1998). Accordingly, it was necessary for the court in *Ellis 1* to determine whether or not Provident was lawfully permitted to cut off Ellis' right to commissions on renewals of policies written for the suburban areas.

Likewise, the second prong of collateral estoppel is met as a result of *Ellis 1* because Ellis had a "full and fair opportunity" to litigate the issue of whether Provident could lawfully change Ellis' incentive compensation. In determining whether a party has had a "full and fair opportunity" to litigate an issue in a prior proceeding, New York Courts look at several factors, including "the forum for the prior litigation, its extensiveness, and the competence and experience of counsel, availability of new evidence, and indications of a compromise verdict." *Murphy*, 761 F.2d at 883. Each of these factors supports the application of the doctrine of collateral estoppel to this case: the forum for the present case is identical to the forum in *Ellis 1;* the issue of whether Provident has the right to alter the incentive compensation of branch managers was extensively litigated in *Ellis 1*, a fact which is evidenced by the fact that Ellis now relies principally on the depositions and trial testimony taken in *Ellis 1* in opposing Provident's Motion for Summary Judgment; and Ellis was represented in *Ellis I* by the same experienced counsel who represent him in the present instance.

B. Insufficiency of Ellis' claims

1. Implied-in-fact contract

Ellis claims to have obtained an implied-in-fact contractual right to commissions on re-

---

effect on this Court's analysis of whether a similar implied-in-fact contract exists with respect to Ellis. At most, *Eskra* suggests that a particular branch manager who was singled out for particu-

larly adverse treatment by having his territory split was entitled to some compensation based on the lost value of renewal commissions.

newals of original insurance written prior to the 1994 incentive compensation overhaul as a result of Provident's practice to buyout in the event of territorial division and alleged verbal assurances made to him by Provident management that these buyouts would continue in the future or would apply other than when territory was substituted or taken from a branch manager.

 It is well settled under New York law that although there is no written contract between two parties, "a contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *In the Matter of Boice,* 226 A.D.2d 908, 910, 640 N.Y.S.2d 681 (3d Dep't.1996); *see also Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–504, 369 N.Y.S.2d 400, 330 N.E.2d 414 (1975); *Miller v. Schloss,* 218 N.Y. 400, 406, 113 N.E. 337 (1916). An implied-in-fact contract is "just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Jemzura,* 36 N.Y.2d at 504, 330 N.E.2d 414, 369 N.Y.S.2d 400; *see also Miller,* 218 N.Y. at 406, 113 N.E. 337 (implied-in-fact contracts are "true contracts"). "A contract cannot be implied in fact where the facts are inconsistent with its existence, or against the declaration of the party to be charged, or where there is an express contract covering the subject-matter involved, or against the intention or understanding of the parties; or where an express promise would be contrary to law. The assent of the person to be charged is necessary, and, unless he has conducted himself in such a manner that his assent may fairly be inferred, he has not contracted." *Miller,* 218 N.Y. at 406–407, 113 N.E. 337.

 All of the evidence of an implied-in-fact contract cited by Ellis contemplates possible buyouts in the event of a division of territory. This evidence is irrelevant here since the 1994 overhaul in compensation did not involve any territory division. There was no split at that time of Ellis territory, and Ellis disclaims any implied contractual right as a result of the earlier division of the New York City territory in 1991.

Moreover, the Record is clear that there are several undisputed facts which belie Ellis's claim that Provident breached an implied-in-fact contract in 1994 when it altered its incentive compensation scheme. Ellis, in *Ellis I,* conceded under oath that the defendants "had the right to change [the incentive compensation plan]" when it made the changes challenged here. Ellis now attempts to qualify this admission by arguing that although Provident had the right to change the incentive compensation plan, doing so constituted a breach of an implied-in-fact contract. A party "may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572–73 (2d Cir.1991).

Aside from Ellis' inability to establish an implied contract in fact, the court notes that even had such a contract been established, the statute of frauds provides an independent basis for rejecting Ellis' claim. The statute of frauds, General Obligations Law § 5–701, provides in pertinent part:

> Every agreement, promise, or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: 1. By its terms is not to be performed within one year from the making thereof. . . .

 Under New York law, the Statute of Frauds is an available defense even against implied-in-fact contract claims. *American Fed. Group. Ltd. v. Rothenberg,* 136 F.3d 897, 910 (2d Cir.1998). Moreover, New York law is clear that agreements to pay commissions on premiums paid on insurance renewals are subject to the Statute of Frauds. *See I. Levine and Sons, Inc. v. Physicians' Reciprocal Insurers,* 667 N.Y.S.2d 279–280 (2d Dep't 1998); *Apostolos v. R.D.T. Brokerage Corp.,* 159 A.D.2d 62, 65–66, 559 N.Y.S.2d 295 (1st Dep't 1990) ("Defendant also promised to pay plaintiff a percentage of commission earned every time one of the insurance policies which plaintiff

had originally placed with defendant was renewed...." *Held,* this portion of the contract was within the Statute of Frauds since "renewals were solely dependent on the acts of third parties" and, in the absence of a writing was unenforceable). Likewise, Ellis' claim for a lump sum payment based on the net present value of all lost renewal commissions over a defined period runs afoul of *Apostolos* to the extent that Provident would remain liable for the indefinite future acts of third parties. *Cf. Elsfelder v. Cournand,* 270 A.D. 162, 59 N.Y.S.2d 34 (1st Dep't 1945). In *Elsfelder,* the plaintiff, a sales manager and salesman sued for commissions under an oral contract terminable by either party on thirty days written notice, but in the event of such termination by either party, the defendant would nevertheless remain obligated, without limitation of time, to continue to pay the salesman's commissions on any reorders thereafter received by defendant. Neither this alleged agreement nor any memorandum thereof was subscribed by the party to be charged. *Held,* such a contract by its terms could not be performed within a year from the making thereof and consequently is within the Statute of Frauds. To the same effect, *see Cohen v. Bartgis Bros. Co.,* 264 A.D. 260, 35 N.Y.S.2d 206 (1st Dep't 1942); aff'd 289 N.Y. 846, 47 N.E.2d 443 (1943); *Hausen v. Academy Printing & Specialty Co.,* 34 A.D.2d 792, 311 N.Y.S.2d 613 (2d Dep't 1970) (oral agreement for commissions on sales to customers produced either through himself or defendant on reorders).

### 2. Promissory Estoppel

■ Under New York law, promissory estoppel has three elements: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Esquire Radio & Elecs. Inc. v. Montgomery Ward &* Co., 804 F.2d 787, 793 (2d Cir.1986) (quoting Restatement (Second) of Contracts § 90 (1981)). "The doctrine of promissory estoppel as a bar to assertion of a Statute of Frauds defense has been strictly construed to apply only in those rare cases where 'the circumstances [are] such as to render it unconscionable to deny'

the oral promise upon which the promisee has relied." *Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1125 (S.D.N.Y.1987) (internal citations omitted) (citations omitted); *see also Merex A.G. v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 826 (2d Cir.1994) (when promissory estoppel is asserted to contravene the effect of the Statute of Frauds, a plaintiff must demonstrate an 'unconscionable injury', *i.e.,* injury beyond that which flows naturally ... from the non-performance of the unenforceable agreement").

■ Provident did not make a specific and definite promise to Ellis that his renewal commissions would be vested. In *Ellis I,* Ellis testified that Mr. Fridl told him "not to worry" about possible changes to the incentive compensation scheme employed by Provident and that the buyout practice in the event of a territorial division would continue in the future. By his own admission Ellis conceded that he had no other basis other than those vague incomplete assurances for concluding that the incentive compensation scheme would remain unchanged. These vague promises, even if taken as true, are neither "clear" nor "unambiguous" nor sufficient to support the promissory estoppel claim asserted herein.

Also, Ellis cannot be said to have "reasonably relied" on Mr. Freidl's vague statements in light of his own admissions that Provident had the discretion to alter his incentive compensation and in fact did do so on at least three occasions prior to 1994.

Finally, Ellis alleges no injury that could be held unconscionable. Ellis asserts that he was injured because he "accept[ed] the position of New York Branch Office manager and ... devot[ed] years of effort ... to develop a substantial block of business." Other than in the most exceptional cases, courts have consistently held that "lost fees ... constitute insufficient injury to invoke the doctrine [of promissory estoppel as a bar to the assertion of a Statute of Frauds defense]". *See Steinborn v. Daiwa Sec. Am., Inc.,* 1995 WL 761286, *6; *see also, Philo Smith & Co. v. USLIFE Corp.,* 554 F.2d 34, 36 (2d Cir.1977) (affirming district court's dismissal of complaint in which plaintiff's only substantial in-

jury was loss of finder's fee); *Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1126 (nonpayment of legal fees was "merely a loss from nonperformance of a void agreement" and therefore not sufficiently unconscionable to estop reliance on a Statute of Frauds defense). Moreover, it is well established under New York law that injuries resulting in an employee's decision to forgo other career opportunities do not constitute unconscionable injuries. *See Celi v. Canadian Occidental Petroleum Ltd.,* 804 F.Supp. 465, 471 (E.D.N.Y.1992) (holding that former employee's allegations that in reliance upon promise of three-year employment he relinquished secure position and was restrained from seeking employment elsewhere did not rise to level of unconscionable injury required to recover under the promissory estoppel doctrine).

### 3. Negligent Misrepresentation

"In order to establish a claim for negligent misrepresentation, plaintiff [is] required to show that defendant had a duty, based upon some special relationship with [the plaintiff], to impart correct information, that the information was false or incorrect and that [the plaintiff] reasonably relied upon the information given by defendant." *Bower v. Atlis Sys., Inc.,* 182 A.D.2d 951, 953, 582 N.Y.S.2d 542 (3rd Dep't 1992). A negligent misrepresentation claim must be plead in accordance with the specificity criteria of Fed.R.Civ.P. 9(b). *Aniero Concrete Company, Inc. v. New York City Construction Authority,* 1997 WL 3268, *14 (S.D.N.Y.1997).

Under New York law, the "special relationship" required to support a negligent misrepresentation claim must be based upon a fiduciary duty owed by the defendant to the plaintiff. *See Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir.1992). Ellis, as a matter of law, is unable to demonstrate that a fiduciary duty is owed to him by Provident. *See Lind v. Vanguard Offset Printers, Inc.,* 857 F.Supp. 1060, 1067 (S.D.N.Y.1994) ("[U]nder New York law, an employer-employee relationship is not fiduciary in nature.");

Ellis argues that a negligent misrepresentation claim may also be supported by a finding of privity or near-privity between the parties. *See Aniero,* 1997 WL 3268 at *14 fn. 15; *In re Leslie Fay Cos.,* 918 F.Supp. 749, 769 (S.D.N.Y.1996). *But see Vannest v. Sage, Rutty & Co., Inc.,* 960 F.Supp. 651, 657 (W.D.N.Y.1997). The court does not address this particular issue, as Ellis' negligent misrepresentation claim fails even if privity or near-privity is a proper basis for establishing a "special relationship." Ellis' negligent misrepresentation claim is predicated on statements by Mr. Fridl that Ellis "could continue to rely on Provident's buyout practice ...," that Ellis should not worry about changes to the incentive compensation system, and similar statements made by Mr. Fridl to other branch managers. These alleged promises of future conduct do not give rise to liability for negligent misrepresentation under New York law. *See Murray v. Xerox Corp.,* 811 F.2d 118, 123 (2d Cir.1987) ("Promises of future conduct are not actionable as negligent misrepresentations."); *US West Financial Serv., Inc. v. Tollman,* 786 F.Supp. 333, 344 (S.D.N.Y.1992) (same); *Bower v. Atlis Systems,* 182 A.D.2d 951, 953, 582 N.Y.S.2d 542 (3rd Dep't 1992) (defendants alleged assurance of employment not an "impartation of false information for [plaintiff's] guidance but merely ... an expression of future expectation.").

Moreover, Ellis' reliance on Mr. Fridl's alleged representations was unreasonable in light of the express provision in the Chandler papers authorizing changes in the incentive compensation system pursuant to which Provident altered the compensation system in 1976, 1991 and 1992.

### 4. Unjust Enrichment

Liability for unjust enrichment rests on the equitable principle that a person "shall not be allowed to enrich himself unjustly at the expense of another." *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (1916). To state a claim for unjust enrichment, a plaintiff must plead that: "(1) a defendant has been unjustly enriched; (2) the enrichment was at plaintiff's expense; and (3) defendant's retention of the benefit would be unjust." *Blank v. Baronowski,* 959 F.Supp. 172, 178 (S.D.N.Y.1997).

A plaintiff may not circumvent the statute of frauds by claiming unjust enrichment. *See Huntington Dental & Medical Co. v. Minnesota Mining & Manuf. Co.*, 1998 WL 60954, *7 (S.D.N.Y.1998) ("[New York] law prevents a plaintiff from circumventing the reach of the statute of frauds by asserting a quasi-contract claim, such as . . . unjust enrichment"); *Sater v. Wyckoff Heights Hosp.*, 228 A.D.2d 427, 427, 643 N.Y.S.2d 664 (2d Dep't 1996); ("To the extent the plaintiff seeks to recover . . . for unjust enrichment, . . . based on the alleged oral agreement, [this claim] must be . . . dismissed."); *American–European Art Associates, Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 171, 641 N.Y.S.2d 835 (1st Dep't 1996) (". . . plaintiffs may not utilize a quantum meruit theory of recovery to circumvent the Statute of Frauds"); *Tallini v. Business Air, Inc.*, 148 A.D.2d 828, 830–31, 538 N.Y.S.2d 664 (3rd Dep't 1989) ("[P]laintiff's claim that he was denied commissions which he was entitled to under a theory of unjust enrichment depends on proof of the oral contract and therefore is also barred under the Statute of Frauds.").

### 5. Constructive Trust

Four elements must be present on order to impose a constructive trust: "(1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; (4) and unjust enrichment." *A. Brod, Inc. v. SK&I Co., LLC,* 1998 WL 119644, *11 (S.D.N.Y. 1998).

Ellis contends that a fiduciary relationship is not an absolute requirement for a constructive trust. *See Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 743 F.Supp. 176, 179–180 (S.D.N.Y.1990). While this may be so, courts have repeatedly rejected claims of constructive trust in the employment context due to the absence of a fiduciary relationship between an employer and an employee. *See, e.g., Alter v. Bogoricin,* 1997 WL 691332, *16 (S.D.N.Y.1997) (noting that a constructive trust is generally not available in the absence of a fiduciary duty); *Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1474 (S.D.N.Y.1992) ("[plaintiff] has not alleged a confidential relationship sufficient to satisfy the first re-

quirement for a constructive trust. As case law makes clear, a close relationship between an employer and an employee is not enough."); *Dyckoff v. Prime Designs Licensing, Ltd.,* 1984 WL 567, *3 (S.D.N.Y.1984) ("[A]n employment agreement does not create the fiduciary relationship necessary for the imposition of a constructive trust."); *Farrell v. Comstock Group, Inc.,* 211 A.D.2d 493, 493, 621 N.Y.S.2d 325 (1st Dep't 1995) (court refused to impose a constructive trust where "the plaintiff showed only an ordinary employer-employee relationship."). *Waldman v. Englishtown Sportswear, Ltd.,* 92 A.D.2d 833, 835–36, 460 N.Y.S.2d 552 (1st Dep't 1983) ("The mere fact that defendant . . . may owe money to plaintiff for compensation under the agreement of employment, does not make that defendant a fiduciary. Similarly, no basis exists for the imposition of a constructive trust.").

In addition, constructive trust is an equitable doctrine that applies only when equity so demands.

*In Re Koreag,* 961 F.2d 341, 353 (2d Cir. 1992). Under the circumstances of this case, even assuming all the facts as stated by Ellis as true, there is no legal reason to impose a constructive trust on Provident's assets.

### 6. Improper Withholding of Wages

Ellis alleges that Provident violated § 193 of the New York Labor Law. Section 193(1) provides as follows:

1. No employer shall make any deduction from the wages of an employee, except deductions which:

 a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or

 b. are expressly authorized in writing by the employee and are for the benefit of the employee. . . .

Ellis' claim is insufficient as a matter of law. The underlying contract claim upon which Ellis premises his wage law claim is invalid under the statute of frauds. Ellis cannot make any statutory claim for wages under a contract which is barred by the statute of frauds. *See Zaitsev v. Salomon*

*Brothers, Inc.,* 60 F.3d 1001, 1004 (2d Cir. 1995) ("Because [plaintiff] can prove no contract that will satisfy the Statute of Frauds, his claim of unpaid wages under New York Labor Law § 190 *et seq.* was properly dismissed."); *Tierney v. Capricorn Investors, L.P.,* 189 A.D.2d 629, 631, 592 N.Y.S.2d 700 (1st Dep't 1993) ("The plaintiff cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages.").

Moreover, the compensation to which Ellis claims an entitlement are not "wages" for the purposes of the New York Labor Law. *See, e.g., Colangelo v. Fresh Perspectives,* 948 F.Supp. 331, 332 (S.D.N.Y.1996) ("The court in *Dean Witter* stated unequivocally that 'the term "wages," despite its broad definition . . . does not encompass an incentive compensation plan.' This Court finds no basis not to apply that conclusion to the facts here alleged by plaintiff.") (quoting *Dean Witter Reynolds, Inc. v. Ross,* 75 A.D.2d 373, 380, 429 N.Y.S.2d 653 (1980)); *Canet v. Gooch Ware Travelstead,* 917 F.Supp. 969, 995 (E.D.N.Y.1996) (unpaid incentive compensation not considered "wages" for the purposes of the Labor Law).

### CONCLUSION

Resolving ambiguities and drawing reasonable inferences in favor of Ellis, it is determined that Ellis is collaterally estopped from asserting that renewal commissions were vested and that the statute of frauds applies to the implied contract to pay commissions on renewals of policies after change of the Compensation Plan and that each of the claims asserted by Ellis is insufficient as a matter of law. Summary judgment is granted in favor of Provident pursuant to Fed. R.Civ.P. 56, with costs to the defendants. The cross-motion is denied. Judgment shall be entered accordingly.

So Ordered.