Gary J. MISSIGMAN, Plaintiff,

v.

USI NORTHEAST, INC. and The Zurich American Insurance Company, Defendants.

No. 99 Civ. 4763(CM).

United States District Court, S.D. New York.

Feb. 7, 2001.

James P. Donohue, Jr., Gilbride Tusa Last & Spellane LLC, New York City, for Plaintiff.

David G. Januszewski, Cahill Gordon & Reindel, New York City, Thomas R. De-Rosa, Orlando, FL, for Defendants.

MEMORANDUM DECISION AND OR-
 DER GRANTING IN PART DE-
 FENDANTS' MOTION FOR SUM-
 MARY JUDGMENT, GRANTING
 DEFENDANT USI NORTHEAST'S
 MOTION TO STRIKE, AND DENY-
 ING PLAINTIFF'S MOTION FOR
 SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Gary J. Missigman brings this action against defendant USI Northeast, Inc. ("USI") for breach of contract, breach of an implied contract, promissory estoppel and quantum meruit, against defendant The Zurich American Insurance Company ("Zurich") for intentional interference with business relations, and against both defendants for fraud and a joint venture to commit fraud. USI has asserted counterclaims against Missigman in this action for breach of contract and unjust enrichment, and has moved to strike plaintiff's claim for promissory estoppel against USI. Plaintiff has moved for summary judgment on USI's counterclaims, and both defendants have moved for summary judgment on all of the claims against them.

For the reasons stated below, USI's motion for summary judgment on the breach of contract, breach of implied contract, and fraud claims is granted, and USI's motion for summary judgment on the unjust enrichment claim is denied. USI's motion to strike Missigman's claim for promissory estoppel is granted. Zurich's motion for summary judgment on the tortious inter-ference with business relations and fraud claims is granted, and Missigman's motion for summary judgment on USI's counter-claims of breach of contract and quantum meruit is denied.

## FACTS PERTINENT TO
## THE MOTION

USI[1] offers insurance brokerage services for several lines of insurance, including environmental insurance. Missigman is a licensed insurance broker who developed a Homeowner's Environmental Loss Protection ("HELP") Program to insure homeowners against the costs of environmental damage caused by residential underground fuel oil tanks. In the states where it was adopted, the program allowed the fuel oil dealers to present the program to homeowners, and the fees collected by the fuel dealers were then forwarded on to the insurance broker. The HELP Program was offered in New York, New Jersey, Massachusetts, Connecticut, Pennsylvania and Delaware. New Jersey, which had the best-organized association of fuel oil dealers, the New Jersey Fuel Merchant's Association ("FMA"), had the most dealers enrolled in the HELP Program.

Missigman worked at Hagedorn & Company until late 1996, when Jeffrey Welsch, then President of New Business Development at USI, became interested in having Missigman set up a similar residential underground fuel oil tank program at USI. Missigman met with USI representatives in October 1996, and the parties discussed the possibility of Missigman's acquiring the HELP Program from Hagedorn, or setting up a similar program for USI. They also discussed giving Missigman an interest in any program that was set up and paying him for any costs associated with acquiring the program from Hagedorn, such as legal fees.

On October 23, 1996, Missigman learned that the underwriter for the HELP Program was going to withdraw on February 1, 1997, and he shared that information with USI. Welsch and Tom O'Neil, Chairman and Chief Executive Officer of the Northeast Region of USI Insurance Services Corp., the parent of USI, considered purchasing the HELP Program, but decided instead that USI should hire Missigman to start a similar program at USI. Missigman asked that USI put its proposal in writing.

### 1. Letters of Intent

On or about October 30, 1996, Welsch sent Missigman a "letter of intent." The letter contained the following key terms: Missigman would be employed as Vice President and Producer/Program Development for a term of one year at a salary of $104,000 plus employee benefits. USI would provide $30,000 in "development-related costs" and support the design and implementation of an insurance program. If the program were "successful," USI would endeavor to make the program a separate profit center to be managed by Missigman; at the end of 36 months, USI "would have the option to capitalize" Missigman's developmental efforts in the program at a price that would "be a reflection of the weighted pre-tax profit" for the three year period, less any long term debt. (Januszewski Aff. at Exh. 1.) The letter said that employment with USI was "contingent on execution of agreements normal to USI employment, including confidential non-solicitation agreements." (Id.)

Missigman had concerns with the October 30, 1996 letter. For example, he thought the "one-year" provision made little sense because the target date for implementation would be February 1, 1997, when the previous underwriter was to withdraw. So Welsch sent Missigman a revised "letter of intent" on November 1, 1996. (Id. at Exh. 2.) The November 1 letter had the same structure as the October 30 letter, but reduced Missigman's term of employment to 90 days; increased the salary to $12,000 per month; increased the commitment to development-related costs to $3,000/month; and provided that USI's "option to capitalize" the program would take place at "a mutually agreed

---

1. For part of the time period relevant to this case, USI Northeast was known as Carpenter & Pelton, Inc. The court will refer to this defendant only by the name USI.

period (estimated between 24 and 36 months)." The second paragraph of the letter noted that Missigman's employment was "subject to the execution of an employment agreement." (Id.) The last paragraph reiterated that "[a]ll of the above, of course, would be contingent on execution of agreements normal to USI employment, including confidential-non-solicitation agreements." (Id.) Missigman contends that O'Neil and Welsch represented those provisions as being a mere formality.

Both letters provided that for the project to be "successful," certain hurdles needed to be met. The November 1 letter provided that Missigman must: have a market (acceptable to USI Security Community guidelines) committed to underwrite and support the program, including an exclusive MGA agreement or equivalent, within 30 days of employment; have a formal endorsement, or agreement in principal, executed by more of the leading state associations that would have need for the program within 45 days; and demonstrate revenue "flowing and being booked relative to this new program" by the 75th day. (Id.)

Missigman began working for USI on November 1, 1996 in their Mount Kisco, New York Office, pursuant to the terms of the November 1 letter of intent. He did not receive or sign a "normal" employment agreement from USI prior to commencing work.

2. Performance and Continued Negotiations

Missigman contacted potential underwriters for the new Storage Tank Environmental Protection ("STEP") Program. The Zurich American Insurance Company ("Zurich") became the principal prospective underwriter. Zurich and Missigman discussed the rates to be charged for the STEP Program; caps on the cost of clean-up by clean-up contractors; and a mandatory provision for deductibles. Shortly thereafter, Zurich and USI entered into a "strategic alliance" in which Zurich be-

came an equity holder in USI Holding Corporation, the parent corporation of USI. The STEP Program was part of the strategic alliance.

Missigman completed the tasks set forth in the November 1 letter, but not within the time frame set forth. The termination date of the underwriting for the HELP Program had been pushed back to March 13, 1997, and Missigman contends that USI no longer needed to have a program in place by the original date. In or about early February 1997, the STEP program was up and running. Missigman had confirmed Zurich as an underwriter, helped USI obtain an endorsement from the FMA, and a positive revenue stream resulted.

On or about February 2, 1997, Missigman was sent a sample USI employment agreement, which contained many of the provisions common to. USI employment contracts, including a "non-solicitation" provision of the type noted in the November 1 letter. In an accompanying memorandum, "Re: Follow-up to Employment Contract," O'Neil wrote:

> "As you are aware, we have been going slowly in terms of laying the ground work for a new contract awaiting some word on whether the 'hurdles' outlined in the original memorandum were met. At this point we need only receive the endorsement of one of the principle [sic] associations .to move ahead further. . . . We have clearly now reached the point where we must decide to move on with the development of the program and formalize the relationship with the contract previously discussed . . . . [w]e should be able to draft a bonafide Letter of Intent to be followed by a contract."

(Januszewski Aff. at Exh. 5.) At a meeting with Welsch and O'Neil on February 13, 1997, Missigman was told that he would have a draft contract tailored to his personal situation by mid-May.

After USI obtained the endorsement of the FMA, Hagedorn sought an injunction

against USI and commenced an arbitration. USI and Missigman had anticipated legal action by Hagedorn, either to restrain Missigman from setting up a competing program or for damages arising from breach of contract. USI orally promised Missigman that it would pay an advance for his legal fees and/or costs related to an arbitration instituted against Missigman by Hagedorn. USI met that commitment, though it now contends that this was a loan to be deducted from the purchase price of any eventual sale of Missigman's interest in the STEP program, and to be returned in the event that contract negotiations fell through.

In May 1997, USI provided Missigman with a draft Asset Purchase Agreement, which contained an Employment Agreement ("Draft # 1") (Id. at 5.) After reviewing Draft # 1, Missigman was concerned about several provisions that were inconsistent with the discussions he had held with USI in October 1996. For example, USI sought to deduct a management fee of 20% from the gross revenue of the STEP Program. Missigman wrote a memo dated June 9, 1997 that said:

> I am frankly concerned with the spirit and content of the contractual terms presented and I feel they do not live up to the terms of our original negotiations and subsequent outline of a contract. The restrictive elements of the contacts, both personally and financially are disturbing. I reject these contracts in their entirety and respectively request that contracts be drawn that live up to the spirit of our original discussions and subsequent contract outline. If we are to negotiate these terms as presented I don't think we will even get to a position of equanimity.

(Id. at Exh. 6.) In the meantime, Missigman continued to work, and USI continued to pay him a salary.

On or about October 3, 1997, Missigman sent a letter to O'Neil saying that "before entering into a contract, there are certain basic issues which must be resolved." The letter proposed different terms regarding the capitalization of Missigman's interest in the STEP Program. (Id. at Exh. 7.) He continued by saying that "If we can come to agreement on the above issues, much of the proposed Asset Purchase Agreement becomes irrelevant and greatly simplified. We can then move rapidly towards concluding our agreement and commencing the project for our mutual success. However, if we cannot come to an understanding, it will be best for all concerned that we no longer waste our time and proceed on our separate paths." (Id.)

On November 9, 1997, Tom O'Neil wrote a memo to John Addeo, president of USI Holdings Corporation, outlining some of the remaining "issues" relative to Missigman and the STEP Program. He wrote: "[Missigman's] agreement to capitalize his value in the program was agreed to from inception as outlined in the letter of intent. In fact it was one of the principle reason [sic] he agreed to join USI, because we were offering him something no one else was. He continuously refers to STEP as his program when in fact, there was no program until we found the market and built it together. The letter of intent outlines our goals to build a program together, a fact he continues to forget." (O'Neil Aff. at Exh. B.)

On or about February 27, 1998, USI provided Missigman's attorney with Draft # 2 ("Draft # 2") of an Asset Purchase Agreement, which also contained a draft Employment Agreement as an exhibit. In a March 11, 1998 letter, Missigman expressed his concern that USI had not paid him $200,000 as an advance against the purchase price of his book of business, as he alleged that he was promised by USI. He wrote: "I have instructed my attorney not to spend his time, or my money, examining the redrafted contracts until or unless we resolve the advance payment issue." (Id. at Exh. 10.) USI alleges that Missigman told them he needed the money to make a down payment on a house, so they paid him $200,000 prior to the signing

of any agreements. Defendant contends that Missigman promised to repay the advance in the event he was fired. When asked what the parties intended to happen to the $200,000 if there were no definitive asset purchase agreement, Missigman responded: "I offered to put the money in escrow, you know. I told Addeo if I ever left the company, you know, and went to work for somebody else, you know, I said: John, we have got a handshake here, you get the money back." (Januszewski Aff. II (Missigman Dep.) at 193.)

The employment agreement attached to Draft # 2 contained the following "Recital," which characterized Missigman's employment relationship with USI as follows:

"WHEREAS, prior to the execution hereof, Executive was employed by the Company on an 'at will' basis, and Executive was compensated fully for all services rendered by him prior to the effective date hereof."

(Id. at Exh. 9.) When Missigman inquired why that phrase had been inserted, O'Neil told him that it was required by the home offices of USI, and would not have an effect on the financial agreement, or the sale of Missigman's interest in the STEP Program.

On or about April 17, 1998, Missigman's attorney sent USI a mark-up of Draft # 2 that contained a number of proposed revisions.

USI sent Missigman a third draft of the Asset Purchase Agreement on or about May 28, 1998 ("Draft # 3"), which included an Employment Agreement as an exhibit, as well as the "at will" language noted above.

On or about July 15, 1998, Missigman sent proposed revisions to Draft # 3 to USI. A face-to-face meeting was arranged for September 16, 1998 to bridge the gap between the parties. Missigman claims that the meeting was held because there were a number of USI employees who were still waiting for formal contracts. A fourth draft ("Draft # 4") resulted and was

sent to Missigman in October 1998. Again, an Employment Agreement was attached to the Asset Purchase Agreement. In a January 6, 1999 letter to USI's attorney Douglas Morea, Missigman's attorney Bob Wolfe provided USI with a number of suggested changes to the documents. At the conclusion of the letter, he wrote: "After we receive revised documents which include the changes set forth herein, Mr. Missigman will cause them to be executed and delivered to you for completion by USI Northeast." (Id. at Exh. 15.)

### 3. Changes in STEP Program and Missigman's Termination

When Missigman's broker's license came up for renewal, he delayed submitting his application until he could complete certain required continuing education credits. He was advised by Donald Gabay, counsel who had represented USI on insurance issues, that he could continue to perform his duties without his broker's license. (Missigman Aff. 39–40.) On February 21, 1999, Missigman received a carbon-copy of an email from Terry Kramer of USI saying that "It is recommended but not mandatory for employees to have the necessary licenses." (Donohue Aff. at Exh. 38.) Missigman delayed scheduling his course for continuing education credits until March 9, 1999.

In late 1998, Zurich refused to expand the STEP Program beyond the states it was already in. O'Neil instructed Missigman to contact another broker to determine if they had underwriters interested in underwriting the STEP Program. The Employers Reinsurance Program ("ERC") agreed to act as underwriter for a premium considerably less than Zurich was willing to accept to continue with the program. The FMA decided to endorse ERC's proposal.

On being notified that the STEP Program was being moved to ERC, Zurich attempted to go to the fuel dealers directly to solicit their business, and sent out an attorney's letter to USI claiming breach of

their oral contract. Zurich and USI arranged a meeting on March 3, 1999, at which Zurich expressed its desire to continue underwriting the program. Plaintiff alleges that USI felt compelled to return the program to Zurich because litigation against USI would blow up USI's plans the following week to go public with a debt offering. Zurich also raised a number of complaints concerning the conduct of USI and Missigman.

USI and Zurich entered into a "settlement agreement" which provided that Zurich would continue to be employed as USI's agent for the STEP Program in New Jersey, Pennsylvania, Connecticut and Massachusetts. The settlement also required that Missigman be severed from any work between Zurich and USI by March 5, 1999. (Donohue Aff. at Exh. 32.) According to plaintiff, the effect of the settlement was that USI was going to split the STEP Program with Zurich, and Missigman's interest was to be eliminated.

On March 5, 1999, USI terminated Missigman on the grounds that he was an "at will" employee who had been working without a valid insurance brokerage license. No Asset Purchase Agreement or Employment Agreement was ever signed or executed by USI or Missigman.

Plaintiff now seeks to enforce the terms of the contracts that USI entered into with plaintiff as set forth in the November 1, 1996 letter, and in Draft # 4 of the Asset Purchase Agreement and Employment Agreement. (Januszewski Aff. at 17 (Pl. Resp. to Interrogs. at 7).)

The draft Asset Purchase Agreement provided that Missigman was to sell to USI his right, title and interest in the Book of Business for 4.25 times the actual Earnings Before Income and Taxes Amortization ("EBITA") for the twelve months ending September 30, 1999, minus acquisition costs. The purchase price was to be made payable to Missigman with a $200,000 down payment. If the purchase price exceeded that amount, then USI would pay Missigman 75% of the Deferred Purchase price in an unsecured promissory note issued by USI, bearing interest of 8% and payable in 24 quarterly installments commencing in January 1, 2000. If the down payment exceeded the purchase price, the difference was to be refunded to USI. (Januszewski Aff. at 14.)

The draft Employment Agreement provided that Missigman would be employed for a term of years at $250,000 per year; was entitled to a bonus of 25% of the modified annual EBITDA; commissions equal to 40% of the property and casualty insurance where Missigman was the originating and servicing producer of record; and vacation time and a monthly travel allowance. (Id.)

Plaintiff seeks damages to compensate him for the salary, bonuses, commissions and other compensation he would have earned under the contract, as well as for the sale of the STEP Program. Defendant seeks dismissal of the complaint, on the ground that there was a clear intent not to be bound by an employment contract or by any other agreements until formal contracts were executed, and that no such contracts were ever executed.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the materi-

al facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## I. Missigman's Claims Against Defendants

### A. Breach of Contract Against USI

Plaintiff alleges that he entered into a contract with USI to sell them his interest in the STEP Program, and to be employed for a term of years, as set forth in the November 1, 1996 letter and Draft # 4 of the Asset Purchase and Employment Agreements. He bases his claim on those written documents, as well as oral promises allegedly made by USI. Defendant responds that there was a clear intent not to be bound by an employment contract or by any other agreements until formal contracts were executed, and that no such contracts were ever executed. USI argues, in the alternative, that the Statute of Frauds would bar the enforcement of any oral agreements between Missigman and USI.

For the reasons stated below, defendant USI's motion for summary judgment on the breach of contract action is granted.

■ Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract. *See Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989). The doctrine of definiteness serves two related purposes. First, unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy. *Id.* at 482, 548 N.Y.S.2d 920, 548 N.E.2d 203. Second, the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement. *Id.*

Of course, when all the essential terms and conditions of an agreement have been set forth in informal written memoranda and all that remains is their translation into a more formal document, such an agreement will be capable of specific performance. *See Brause v. Goldman*, 10 A.D.2d 328, 332, 199 N.Y.S.2d 606, 611 (1960) (citing *Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N.Y. 209, 39 N.E. 75 (1894)). In such a case, there has been a full manifestation of mutual assent, and a complete meeting of the minds has been reached. All that remains is an integration of the agreement already made in another context which, unless otherwise specified is not essential to evidence a consummated understanding. *Id.*

■ But when the parties have clearly expressed an intention not to be bound until their preliminary negotiations have culminated in the execution of a formal contract, they cannot be held liable for breach of contract until that event has occurred. *Id.* "When the wording and sense of letters exchanged between the parties reveal no present intent to form a binding contract, but rather to continue negotiations with the possible ultimate meeting of the minds deferred until some future time, either party may withdraw with impunity prior to that time." *Id.* The question, therefore, is whether the November 1, 1996 letter from Welsch to Missigman demonstrated an intent to form a binding contract, or to continue negotiations with a possibility of a meeting of the minds deferred until a future time.

A framework for analyzing the issue of whether a preliminary agreement is a binding contract or an unenforceable agreement to agree was articulated by Judge Leval in *Teachers Insurance & Annuity Association v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), and applied

by the Second Circuit in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–72 (2d Cir.1989) and most recently in *Adjustrite Systems, Inc. v. Gab Business Services, Inc.*, 145 F.3d 543, 547 (2d Cir.1998).

Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. *See Adjustrite*, 145 F.3d at 548; *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs."). If the preliminary writing was not intended to be binding on the parties at all, the writing is a mere proposal, and neither party has an obligation to negotiate further. *See Brause v. Goldman*, 10 A.D.2d 328, 199 N.Y.S.2d 606, 611 (1st Dep't 1960), aff'd, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961). In some circumstances, however, preliminary agreements can create binding obligations. Usually, binding preliminary agreements fall into one of two categories. *See Adjustrite*, 145 F.3d at 548.

The first is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. *Id.* Such an agreement is fully binding; it is "preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Tribune*, 670 F.Supp. at 498. A binding preliminary agreement binds both sides to their ultimate contractual objective in recognition that, "despite the anticipation of further formalities," a contract has been reached. *Id.* Accordingly, a party may demand performance of the transaction, even though the parties fail to produce the "more elaborate formalization of the agreement." *Id.*

The second type of preliminary agreement, dubbed a "binding preliminary commitment" by Judge Leval, is binding only to a certain degree. It is created when the parties agree on certain major terms, but leave other terms open for further negotiation. The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Tribune*, 670 F.Supp. at 498. In contrast to a fully binding preliminary agreement, a "binding preliminary commitment" does not commit the parties to their ultimate contractual objective, but rather "to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." *Id.* A party to such a binding preliminary commitment has no right to demand performance of the ultimate transaction. Indeed, if a final contract is not agreed upon, the parties may abandon the transaction, as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing. *Id.*

Hence, if a preliminary agreement is of the first type, the parties are fully bound to carry out the terms of the agreement, even if the formal instrument is never executed. If a preliminary agreement is of the second type, the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement. If they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.

Courts confronted with the issue of determining whether a preliminary agreement is binding, as an agreement of either the first or the second type, must keep two competing interests in mind. First, courts must be wary of "trapping parties in surprise contractual obligations that they never intended" to undertake. *Adjustrite*, 145 F.3d at 548 (quoting *Tribune*, 670 F.Supp. at 497). Second, "courts [must] enforce and preserve agreements

that were intended [to be] binding, despite a need for further documentation or further negotiation," for it is "the aim of contract law to gratify, not to defeat, expectations." *Id.* The key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent. "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" *Id.* (citations omitted). Subjective evidence of intent, on the other hand, is generally not considered. *See Rule v. Brine, Inc.,* 85 F.3d 1002, 1010 (2d Cir.1996) (noting that the analysis should not put "disproportionate emphasis ... on any single act, phrase or other expression, but, instead [should consider] the totality of all these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.").

### 1. The *Tribune* Test

■ *Tribune* sets out four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *See Tribune,* 670 F.Supp. at 499–503.

In *Arcadian Phosphates,* 884 F.2d at 72, plaintiffs asserted breach of contract claims based on a memorandum describing the sale of a fertilizer company's phosphate fertilizer business to a joint venture. The parties signed a memorandum of understanding on November 6, 1986 outlining areas of agreement concerning the assets to be purchased, the purchase price, and an option for defendant Arcadian to pur-

chase up to 20% of plaintiff Arcadian Phosphates ("API"). *Id.* at 70. Other provisions were less definite: the memorandum referred to part of the payment as "a note secured to Arcadian's satisfaction" and to additional equity participants in the proposed joint venture as "subject to mutual agreement." *Id.* The memorandum also set deadlines for further action, all subject to the approval of Arcadian's board and API's ability to obtain financing. *Id.* Finally, the memorandum provided that if the negotiations for the sale failed, Arcadian would repay any capital expenditures agreed to and made by API, and that "the service and supply agreement will be negotiated and agreed to by December 31, 1986, and [a] *binding* sales agreement will be completed by December 31, 1986." *Id.* (emphasis added) The Arcadian board subsequently approved what it called the "proposed agreement," and API tendered a cash deposit and incurred expenses of over $100,000 to perform. *Id.*

The market for phosphates went up dramatically in February 1987, and Arcadian informed API that it wanted to own over 50% of the joint venture and to return the down payment. API sued for breach of contract, and the Second Circuit applied the *Tribune* test, looking no further than the first factor—the language of the agreement. The court noted that the memorandum included two references to the possibility that negotiations might fail, and the reference to a binding sales agreement to be completed at some future date, showed that Arcadian did not intend to be bound. *Id.* at 72. The court contrasted this contract with that in *Tribune* itself, 670 F.Supp. at 494 (noting that that memorandum described itself as a "binding agreement") and in *Teachers Ins. & Annuity Ass'n v. Butler,* 626 F.Supp. 1229, 1230 (S.D.N.Y.1986) (parties actually agreed it was binding), and said that "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation

and execution of contract documents." *Arcadian Phosphates,* 884 F.2d at 73 (quoting *Tribune,* 670 F.Supp. at 499). The Second Circuit upheld the lower court's grant of summary judgment, noting that where "a question of intention is determinable by written agreements, the question is one of the law, appropriately decided ... on a motion for summary judgment." *Id.* Because intent was readily determined by examining the memorandum in question, summary judgment was appropriate even though there was considerable partial performance. *Id.*

Similarly, in *Adjustrite Systems,* 145 F.3d at 545–46, defendant ITS sent plaintiff Adjustrite a two-page proposal offering to purchase some of its assets for named consideration. Plaintiffs signed the "agreement," and began working for ITS. Although the agreement called for the execution of a letter of intent, a sales agreement, and two employment contracts, no additional documents were ever executed. Drafts of the sales agreement and two employment contracts were prepared but never finalized or signed. The draft sales agreement, which was entitled "Acquisition Agreement," contained provisions not contained in the agreement. The district court concluded, by looking at the four corners of the agreement, that it was not a binding contract, because there was no intent to be bound until all parties' preliminary negotiations had been memorialized in a set of formal contracts. *Id.* at 547.

The Second Circuit looked to the *Tribune* test, and concluded that the language of the agreement—the "most important" factor—favored the defendants. The agreement was expressly contingent, at least in part, upon the execution of further contracts; it did not expressly state that it was a binding agreement; and it did not provide any express manifestation that the parties were bound by its terms. *Id.* The second factor, partial performance, favored the plaintiff, who had begun performing on the agreement. The last two factors— whether there were open terms in the

contract to be negotiated, and whether the contract was of the type usually committed to writing—strongly favored the defendant. *Id.* at 550–52. The court concluded that the one factor that supported a contrary conclusion—partial performance— was not sufficient to raise a genuine issue for trial because no reasonable factfinder could conclude that the parties agreed on all material elements of the transaction, intended to be fully bound, and considered the formal sales agreement and employment contracts to be unnecessary formalities. *See id.* (citing *Arcadian,* 884 F.2d at 72–73).

■ Applying the *Tribune* test to the case at bar, this court must determine whether the November 1 letter is a fully binding preliminary agreement, or a "binding preliminary commitment." *Adjustrite,* 145 F.3d at 548. This court is aware of the "strong presumption against finding binding obligations in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Arcadian Phosphates,* 884 F.2d at 73. For the reasons stated below, I conclude that the November 1 letter was a preliminary commitment, binding the parties only to negotiate the open issues in good faith in an attempt to reach their objective.

a. Language of the Agreement

The first *Tribune* factor, the language of the agreement, is "the most important." *Arcadian,* 884 F.2d at 72. Here, the first factor strongly supports the conclusion that the November 1, 1996 letter was not a fully binding preliminary agreement. The letter does not expressly state that it was a binding agreement, nor does it provide any express manifestation that the parties were bound by its terms. Rather, it is a preliminary letter, which uses conditional terms and states that USI "would envision [Missigman's] joining" as Producer/Program Development.

While the November 1 letter set forth specific terms of employment, including a term of employment, salary, and an option by USI to "capitalize" on the program being set up by Missigman between 24–36 months (Januszewski Aff. at Exh. 2.), it also contained an express reservation of the right not to be bound. *See Adjustrite*, 145 F.3d at 548 (citing *Tribune*, 670 F.Supp. at 499–503). The letter twice mentioned the lack of finality of the letter agreement. The second paragraph of the letter noted that Missigman's employment was "subject to the execution of an employment agreement"; and the last paragraph reiterated that "[a]ll of the above, of course, would be contingent on execution of agreements normal to USI employment, including confidential-non-solicitation agreements." (Id.) The formal agreements were never executed, though the parties negotiated formal drafts (which were subjected to significant changes) during the period of February 2, 1997 to January 6, 1999.

Like the contracts in *Arcadian Phosphates*, 884 F.2d at 72 (noting in two places the possibility that negotiations might fail, and referring to a binding sales agreement that was to be negotiated at a future date), and *Adjustrite Systems*, 145 F.3d at 545–46 (calling for the execution of a letter of intent, a sales agreement, and two employment contracts), the November 1 letter contains an express reservation of the right not to be bound.

### b. Partial Performance

The second factor—whether there has been partial performance of the contract—strongly favors the plaintiff. The November 1 letter provided that Missigman would receive monthly compensation of $3,000 for a 90–day period, and set specific hurdles for Missigman to accomplish. While the details of the letter were "contingent upon execution of agreements normal to USI employment," Missigman began to perform on the basis of the November 1 letter. Missigman achieved all of the hurdles set forth in the letter: he secured Zurich as an underwriter, confirmed FMA approval, and got the STEP Program off the ground. The letter said that if the program was "successful," i.e. the hurdles were achieved, then Missigman would share in a growth-based bonus formula to the extent that the program produced revenue in excess of a pre-determined pre-tax formula.

USI compensated Missigman as promised by the letter, employed Missigman during the time period when the Draft Asset Purchase and Employment Agreements were being negotiated, and continued to pay him a salary. Furthermore, USI provided Missigman $200,000 as an "advance" against the ultimate purchase price of the STEP Program. And Missigman continued to work for USI for another two years after meeting the hurdles in anticipation of selling his interest in the STEP Program. In fact, Missigman was prepared to sign and execute the Asset Purchase Agreement and Employment Agreement after his changes to Draft # 4 were incorporated. This is far more than the part performance noted by the Second Circuit in *Arcadian Phosphates* and *Adjustrite*. There is no doubt that the parties partially performed on the basis of the November 1 letter. Indeed, Missigman substantially performed.

### c. Agreed Upon Terms

The third factor is the existence of open items—whether any terms of the contract remained open to be negotiated. This factor weighs in favor of defendant USI, for the Asset Purchase Agreement and Employment Agreement specific to Missigman had not even been drafted at the time of the November 1 letter. The fact that the parties marked up four drafts of the Asset Purchase Agreement and Employment Agreement over the next two years suggests that, at the time of the November 1 letter, nearly all terms of the contract remained to be negotiated.

Missigman rejected a May 1997 version of an Asset Purchase Agreement (Draft # 2) and an Employment Agreement, writing that he "reject[ed] the contracts in their entirety and respectively request[ed] that contracts be drawn that live up to the spirit of our original discussions and subsequent contract outline." (Id. at Exh. 6.) He sent a letter to O'Neil on or about October 3, 1997, saying that, "[B]efore entering into a contract, there are certain basic issues which must be resolved.... If we can come to agreement on the above issues, much of the proposed Asset Purchase Agreement becomes irrelevant and greatly simplified. We can then move rapidly towards concluding our agreement and commencing the project for our mutual success. However, if we cannot come to an understanding, it will be best for all concerned that we no longer waste our time and proceed on our separate paths." (Id. at Exh.7.) As late as his March 11, 1998 letter to John Addeo, Missigman wrote that "I shall work very hard and diligently to ready a contract with the company which will be mutually satisfactory to both of us." (Januszewski Aff. at Exh. 10.)

In short, the evidence strongly suggests that at the time of the November 1 letter, neither party had agreed to all of the terms of the Asset Purchase Agreement or the Employment Agreement.

#### d. Type of Contract

The fourth and final factor is whether the agreement is the type of contract that is usually committed to writing. This factor also weighs in favor of defendants in the case at bar.

■ In making such a determination, courts examine the size of the transaction, the nature of the assets being purchased, and the length of the employment contemplated. *See, e.g., Adjustrite*, 145 F.3d at 551. In *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 83 (2d Cir.1985), a four page document memorializing a settlement of $62,500 was found to be the type of agreement usually committed to writing. The court so held because the "parties evidently thought the terms and language used were complex enough to require substantial redrafting." *Id.*

In the present case, plaintiff alleges that he was signing on to a term of years, at $250,000 per year, plus bonus and commissions. These provisions did not appear in the November 1 letter, but in the draft Employment Agreements being negotiated by the parties between May 1997 and January 1999. The Asset Purchase Agreement provided that Missigman was to sell to USI his right, title and interest in the Book of Business for 4.25 times the actual EBITA for the twelve months ending September 30, 1999, minus acquisition costs. The purchase price was to be made payable to Missigman with a $200,000 down payment. If the purchase price exceeded that amount, then USI would pay Missigman 75% of the Deferred Purchase price in an unsecured promissory note issued by USI, bearing interest of 8% and payable in 24 quarterly installments commencing in January 1, 2000. If the down payment exceeded the purchase price, the difference was to be refunded to USI. (Januszewski Aff. at 14.)

Because of the size of the proposed transaction, and the complexity of the asset purchase agreement of the STEP Program, this clearly was a contract of the type that usually would be committed not only to a writing, but also to a formal contract complete with all standards provisions usually found in sophisticated, formal contracts. *See Adjustrite*, 145 F.3d at 551. In fact, the parties were in the process of negotiating such written documents when plaintiff was fired.

■ In sum, three of the four factors strongly point to the conclusion that the parties here did not intend to be bound to the terms of the November 1, 1996 letter and Draft # 4, until the formal documents were fully negotiated, executed, and deliv-

ered.[2] While the one factor that supports a contrary conclusion—partial performance—strongly favors Missigman (due to the length of time he remained employed), this is not sufficient to raise a genuine issue for trial, for no reasonable factfinder could conclude, on the record and in the face of the objective documentary evidence, that the parties agreed on all material elements of the transaction, intended to be fully bound, and considered the Asset Purchase Agreement and Employment Agreement to be unnecessary formalities. *See Arcadian,* 884 F.2d at 72–73 (affirming grant of summary judgment dismissing breach of contract action even though there was "considerable partial performance," where language of memorandum showed that parties did not intend to be bound until final contract was signed); *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 83 (2d Cir.1985) (reversing district court and holding that parties were not bound to preliminary settlement agreement where three of four factors indicated parties did not intend to be bound until formal documents were executed and delivered and no such formal documents were ever finalized).

■ There is no question that the facts of the present case are somewhat different from those of *Arcadian* and *Adjustrite,* because of the existence of four negotiated, but unsigned drafts of the formal documents that were lacking in those cases. It is true that a mere *intention* to commit an agreement to writing does not prevent a contract from being formed prior to execution. However, as the Second Circuit has noted, "if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a contract." *Winston,* 777 F.2d at 80. I conclude that, at a minimum, USI did not intend to be bound by the Asset Purchase Agreement and Employment Agreement until those documents were formally executed.

For the foregoing reasons, defendant's motion for summary judgment on the breach of contract claim is granted.

### B. Implied Contract

■ Plaintiff claims, in the alternative, that defendant breached an implied contract.

■ It is well settled under New York law that, even if there is no written contract between two parties, "a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Ellis v. Provident Life & Accident Ins. Co.,* 3 F.Supp.2d 399 (S.D.N.Y.1998) (quoting *In Re Boice,* 226 A.D.2d 908, 910, 640 N.Y.S.2d 681 (3d Dep't 1996)). There is a distinction between a contract implied in fact and one implied in law. The latter presupposes unjust enrichment. *See Super v. Abdelazim,* 139 A.D.2d 863, 864, 527 N.Y.S.2d 591 (3d Dep't.1988). An implied-in-fact contract is "just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Ellis,* 3 F.Supp.2d at 399. A contract cannot be implied where the facts "are inconsistent with its existence, or where there is an express contract covering the subject-matter involved, or against the intention or understanding of the parties; or where an express promise would be contrary to law. The assent of the person to be charged is necessary, and, unless he has conducted himself in such a manner that his assent may fairly be inferred, he has not contracted." *Id.* (quoting *Miller v. Schloss,* 218 N.Y. 400, 406, 113 N.E. 337 (1916)).

---

2. Because this court concludes that the parties expressed an intent not to be bound until a formal contract was executed, I decline to address defendant's argument that the Statute of Frauds voids any contract between the parties.

This court has found that there was no enforceable express written contract covering the subject of Missigman's continued employment with USI. The question, therefore, is whether USI conducted itself in such a manner that its assent may fairly be inferred. *See Ellis,* 3 F.Supp.2d at 409. I conclude that it has not.

 A contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement. *Valentino v. Davis,* 270 A.D.2d 635, 638, 703 N.Y.S.2d 609, 612 (3d Dep't 2000). USI expressed its intention not to be bound by the November 1 letter without the execution of ·"agreements normal to USI employment." Discussing the possible formalization of USI's relationship with Missigman, O'Neil wrote: "[w]e should be able to draft a bonafide Letter of Intent to be followed by a contract." (Januszewski Aff. at Exh. 5.) Missigman himself expressed the sentiment that the parties were operating as if there were no long term contract. He wrote in his memo of June 9, 1997 that "I reject these contracts in their entirety and respectively request that contracts be drawn that ·live up to the spirit of our original discussions and subsequent contract outline. If we are to negotiate these terms as presented I don't think we will even get to a position of equanimity." (Id. at Exh. 6.) He further reiterated that thought on October 3, 1997, when he wrote: "[I]f we cannot come to an understanding, it will be best for all concerned that we no longer waste our time and proceed on separate paths." (Id. at Exh. 7.) The foregoing suggest that the parties intended for a long term agreement to be formalized in writing before they were to be bound. *See Valentino,* 270 A.D.2d at 638, 703 N.Y.S.2d 609. Therefore, plaintiff's claim for an implied contract in fact is unavailing here. Defendant's motion for summary judgment on the claim for breach of an implied in fact contract is granted.

### C. Quantum Meruit (Contract Implied in Law)

 Plaintiff also asserts a claim for quantum meruit.

 To state a claim for quantum meruit, a plaintiff must allege that: (1) the plaintiff rendered services to the defendant; (2) that the defendant accepted those services; (3) that the plaintiff expected reasonable compensation for those services; and (4) the reasonable value of the services rendered. *Huntington Dental & Medical Co. v. Minnesota Mining and Manufacturing, Co.,* No. Civ. 95–10959, 1998 WL 60954, *7 (S.D.N.Y.1998).

 If a plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result where the defendant "received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them." *Rule v. Brine,* 85 F.3d 1002 (2d Cir.1996) (quoting *Bradkin v. Leverton,* 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970)). Such a recovery for unjust enrichment is permissible "when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another." *Id.* (quoting *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)).

 USI argues that plaintiff's claim is barred by the Statute of Frauds because a plaintiff "may not circumvent the statute of frauds by claiming unjust enrichment," *Huntington Dental & Medical Co. v. Minnesota Mining and Manufacturing Co.,* 1998 WL 60954, *7 (S.D.N.Y.1998). But plaintiff's claims, while based on a number of writings that this court has just found to be unenforceable, are not viewed as an attempt to couch claims in equity as defendant suggests. Where the complaint asserts claims on theories of both contract

and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted on both theories. *See Rule v. Brine*, 85 F.3d 1002, 1010 (2d Cir.1996).

Missigman rendered services to the USI from a period of November 1, 1996 to March 5, 1999 and USI readily accepted those services. Missigman used his influence with FMA to gain approval for the STEP Program, which he built up from scratch; negotiated drafts of an Asset Purchase Agreement and Employment Agreement for over two years; and left his prior employment, all with the expectation that he would obtain a saleable interest in the STEP Program and that USI would compensate him by buying him out. While Missigman was compensated during the time of his employment at USI, whether Missigman would have done all he did for a straight salary, with no possible equity upside, at the very least raises a question of fact. The question of whether USI received a benefit from Missigman's services that should preclude it from denying an obligation to pay Missigman a sum that fairly represents the value of his interest in the STEP Program will be determined by a jury.

Defendant's motion for summary judgment is denied.

### D. Intentional Interference With Business Relationships Against Zurich

 Plaintiff also brings a claim against defendant Zurich for "intentional interference with business relationships." In its motion for summary judgment, defendant addressed the tort of intentional interference with contract, and the plaintiff made its arguments in direct response to defendant's brief. Neither party actually addressed the elements of a claim for tortious interference with business relations.

 A defendant becomes liable for tortious interference with a plaintiffs business relations when four conditions are met: (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured. *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir.1997). "To state a claim for tortious interference with prospective business relations, a valid contract is not necessary." *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir.1998). "[A] plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Id.* (quoting Restatement (Second) of Torts § 766B (1979)).

Plaintiff alleges that Zurich knew of 'a contract between Missigman and USI, and encouraged USI not only to breach it, but also to turn the STEP Program over to Zurich. As a result, USI did breach its contract, terminated Missigman, and has refused to pay him for the program he designed. To support his allegations, plaintiff charges (1) that USI fired him for failing to have his license renewed only when Zurich made an issue of it (USI had known for months); and (2) that a Zurich representative had taken notes in a meeting with USI where he wrote: Wrongful termination—unjust enrichment ("stealing" of Missigman's capitalized interest in the program). My characterization, not T. O'Neil. (Donohue Aff. at 34.)

At the time Missigman was fired, Zurich was a shareholder of USI Holding Inc., the parent of USI, and claimed a legal interest in the STEP Program. It offered several complaints about the STEP Program and Missigman, arguably in defense of its interests. Plaintiff contends that Zurich was not acting to defend its economic interest as a shareholder. Rather, it was acting to avoid losing to ERC the status as under-

writer of the STEP Program. This is a distinction without a real difference. Both are attempts by Zurich to avoid economic loss, and neither is evidence that Zurich acted with the *sole purpose* of harming Missigman, or that its means were dishonest, unfair or improper. *Goldhirsh,* 107 F.3d at 108. Even the discussion of possible lawsuits to be brought by Missigman such as unjust enrichment (or "stealing" a capitalized interest, as that legal term was described) does not suggest a sole purpose of harming Missigman. It is fully consistent with a desire for economic gain.

 In addition, a party with an "economic or business interest" in the business of another is privileged to interfere with a contract between that business and a third party if the purpose is to protect a party's own economic interests, and that party does not use "improper means." *Foster v. Churchill,* 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996). A motive for economic gain does not constitute "improper means." *Id.* Indeed, unwarranted litigation brought in bad faith with no belief in its merit constitutes "improper means." *Universal City Studios v. Nintendo Co. Ltd.,* 797 F.2d 70, 75 (2d Cir.1986). Zurich was a shareholder of USI Holding Inc., the parent of USI, and claimed an "economic or business interest" in the STEP Program. Missigman offered no proof that the litigation threatened by Zurich was in bad faith or unwarranted. The record evidence is to the contrary—that Zurich had legitimate economic reasons to prevent USI from moving the STEP Program to another underwriter on short notice.

 In the event that plaintiff intended to assert a claim for tortious interference with contract, this court would grant summary judgment to the defendant on that claim as well. In order to state a claim for tortious interference with contract, a plaintiff must establish (1) the existence of a valid and enforceable contract; (2) that defendant knew of the contract; (3) that defendant intentionally and

improperly procured or caused the breach of that contract; and (4) plaintiff was damaged. *See Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996). Because this court has found that there was no valid and enforceable contract between Missigman and USI, plaintiff cannot satisfy the first element of a claim for tortious interference with contract. Defendant Zurich's motion for summary judgment on this claim is therefore granted.

### E. Fraud and Joint Venture to Commit Fraud Against USI and Zurich

 Plaintiff brings a claim for fraud and joint venture to commit fraud against defendants USI and Zurich. To prevail on a fraud claim, a plaintiff must establish by clear and convincing evidence that: (1) the defendant made a material misrepresentation; (2) the defendant knew of its falsity; (3) the defendant possessed an intent to defraud; (4) the plaintiff reasonably relied on the misrepresentation; and (5) the plaintiff suffered damage as a result of the misrepresentation. *See Kaye v. Grossman,* 202 F.3d 611, 614 (2d Cir.2000). Defendants' motion for summary judgment on this claim is granted.

 Plaintiff alleges that USI misrepresented the existence of standard or "normal" contracts in the November 1, 1996 letter. USI responds that the fact that there were no "normal" employment agreements could not possibly be a material misrepresentation that would have induced Missigman to leave his old job and begin working for USI. I agree. Missigman considered leaving Hagedorn at a time when the underwriter of the HELP Program was going to withdraw. He joined USI because of an opportunity to setup and to establish an interest in the STEP Program—not because of a promise of formal documents. Therefore, no reasonable jury could conclude (1) that USI's promise to execute "agreements normal to USI employment" was a material misrepresentation; or (2) that in deciding to work

for USI, Missigman relied on the representation that such agreements existed. There is similarly no evidence that USI knew of the falsity of any statements it made about the existence of such agreements.

In his opposition memorandum, Missigman added three brand new alleged misrepresentations by USI: that USI (1) assured Missigman that the "at will" provision that appeared in Draft # 2 would not affect the economic arrangement; (2) represented to Missigman that he could look for other underwriters for the STEP Program and assured him that they would make matters "right" with Zurich; and (3) promised that Missigman would be allowed to let his broker's license lapse without problem. Without addressing the propriety of plaintiff's adding new arguments at this late stage, *see, e.g., O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989) (noting that a complaint cannot be amended by opposition papers to a motion to dismiss), I conclude that there is no evidence that USI knowingly made any false, material misrepresentations on which plaintiff relied.

 (1) "At Will" Provision. Defendant made no material misrepresentation when it assured Missigman that the "at will" provision that appeared in the Employment Agreements in Drafts # 2–4 would not affect the economic arrangement. The provision said: "WHEREAS, prior to the execution hereof, Executive was employed by the Company on an 'at will' basis, and Executive was compensated fully for all services rendered by him prior to the effective date hereof." (Januszewski Aff. at Exh. 9.) New York (where plaintiff worked) has a longstanding rule that, absent a written or otherwise concrete expression of the duration, terms and conditions of employment, all employment is deemed to be "at will," terminable at any time, for whatever reason, by either employee or employer. *Sabetay v. Sterling*

*Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987); *see also Mulder v. Donaldson, Lufkin & Jenrette,* 208 A.D.2d 301, 305, 623 N.Y.S.2d 560 (1st Dep't 1995) ("[E]mployer's right at any time to terminate an employment at will remains unimpaired in New York, absent a constitutionally impermissible purpose, a statutory proscription or an express limitation in the applicable contract of employment"). Thus, prior to entering into an employment contract, Missigman was, in fact, an at-will employee. So the statement could not have been a misrepresentation as a matter of law.

 (2) Finding Other Underwriters. Plaintiff also contends that USI directed Missigman to look for other underwriters for the STEP Program, but that "once Zurich objected to the move, USI quickly revealed that it considered its 'strategic partnership' with Zurich to be more valuable than the representations it had made to Missigman. Obviously, had Missigman been told that the move to another underwriter would put the program, and his position, at risk, he would not have supported the move." (Pl. Mem. In Opp'n to Summ.J. at 23.). But plaintiff does not identify any false statement made by USI. In particular, he does not even allege, let alone offer any evidence, that USI knew of Zurich's objections at the time it told Missigman to look for other underwriters. By plaintiff's own account, USI called him off as soon as it understood the lay of the land. There is, therefore, no evidence that USI made any misrepresentations to Missigman, either known to be false or with an intent to defraud him.

 (3) Broker's License Can Lapse. There simply is no evidence that USI intended to defraud Missigman by assuring him that he could let his broker's license lapse. In fact, the most explicit statement by USI about the relationship between licenses and employment was made, not to Missigman, but in an email to six other employees on which Missigman was sent a

carbon-copy. The email stated: "It is recommended but not mandatory for employees to have the necessary licenses. Production credits could be assigned to employees who are unlicensed." (Donohue Aff. at 38.) Missigman has not alleged that this message was sent to USI employees with an intent to defraud him.

Missigman also filed an affidavit alleging that he consulted with Donald Gabay, counsel who "had represented USI on insurance issues, including licensing." (Missigman Aff. at ¶ 40.) According to Missigman, Gabay confirmed that he did not need a license to perform the functions that he was performing. (Id.) But there is no evidence that Gabay even represented USI at the time he made that assurance to Missigman, or whether USI authorized the statement. Even if he did, however, Missigman has not alleged that Gabay knew he was making a false statement—only that Missigman relied on it.

As to defendant Zurich, there is not a scintilla of evidence that defendant Zurich made any representations to Missigman at all, let alone false ones.

Therefore defendants' motion for summary judgment on the fraud claim is granted.

 Plaintiff also alleges a cause of action for "joint venture to commit fraud" against USI and Zurich. There is no such tort in New York. Insofar as it is intended as a cause of action for conspiracy to commit fraud, that claim is also dismissed. Under New York law, a claim for civil conspiracy is available only if there is evidence of an underlying actionable tort. *See Scholastic v. Harris*, 80 F.Supp.2d 139, 151 (S.D.N.Y.1999); *Baker v. R.T. Vanderbilt Co.*, 260 A.D.2d 750, 752–53, 688 N.Y.S.2d 726, 729 (3d Dep't 1999) ("Since New York does not recognize an indepen-

dent tort of civil conspiracy, such a cause of action is available only if there is evidence of an underlying actionable tort. Thus, plaintiffs may not maintain their causes of action for civil conspiracy absent a showing of fraud on the part of defendants.") Since the underlying fraud claim is not viable, and there is no substantive tort of conspiracy, the cause of action for conspiracy to commit fraud is deficient. *See Kestenbaum v. Suroff*, 268 A.D.2d 560, 562, 704 N.Y.S.2d 260 (2d Dep't 2000).

### F. Promissory Estoppel

 Defendant has moved to strike plaintiff's claim for promissory estoppel under Fed.R.Civ.P. 12(f).[3] The proposed Joint Pretrial Order in this case was due on May 22, 2000, and the promissory estoppel claim was added in plaintiff's section of the proposed Order. The claim was included over USI's objection, and USI reserved its right to bring a motion to strike.

The plaintiff did not assert a claim for promissory estoppel in the Complaint, and did not do so during the period of discovery in this case—December 7, 1999 to May 12, 2000. This court set a cut-off date for amending the pleadings for October 31, 1999, *see* Aug. 23, 1999 Consent Scheduling Order, and plaintiff did not make a motion for leave to amend his Complaint during that time. Plaintiff responds that he is not attempting to amend its pleadings. Rather, he argues that promissory estoppel is a theory of an implied contract claim, a cause of action already included in the Complaint, and that defendant would not be prejudiced by including it. I disagree.

Plaintiff may not now assert new claims that have not been subject to discovery. Courts routinely refuse to allow parties to raise additional claims or defenses, for the

---

**3.** Rule 12(f) states that: "Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f).

first time, in the pretrial order after the completion of discovery. *See Malarkey v. Texaco, Inc.,* No. 81 Civ. 5224, 1990 WL 241588 (S.D.N.Y.1990) (holding that new claims proposed by plaintiff added in the Joint Pretrial Order should have been asserted from the outset, particularly where they did not become apparent only after seeing defendant's files in discovery); *Shafarman v. Ryder Truck Rental, Inc.,* No. 83 Civ. 3000, 1984 WL 904 (S.D.N.Y. Sept. 24, 1984) (precluding a claim for contractual indemnification raised for the first time in the Joint Pretrial Order on the grounds that prejudice would result); *Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 700 F.Supp. 127 (S.D.N.Y.1988) (disallowing the inclusion of additional theories of fraud raised by defendant in the Joint Pretrial Order).

■ While a claim for an implied contract in fact and one for promissory estoppel are both grounded in equitable principles, a plaintiff must establish different elements to be successful. For example, a claim for an implied contract requires that plaintiff prove that there were inferences to be drawn from the conduct of the parties that they intended to be bound by a contract. *Ellis v. Provident Life & Accident Ins. Co.,* 3 F.Supp.2d 399 (S.D.N.Y. 1998). On the other hand, a promissory estoppel claim requires plaintiff to prove a promise clear and unambiguous in its terms; reliance by the party to whom the promise is made; that such reliance to be both reasonable and foreseeable; and that the party asserting the estoppel was injured by his reliance. *Sanyo Electric, Inc. v. Pinros & Gar Corp.,* 174 A.D.2d 452, 571 N.Y.S.2d 237 (1st Dep't 1991).

Plaintiff had ample time to amend his Complaint. This lawsuit was filed on July 1, 1999, and this court issued an order that disallowed amendments to pleadings after October 31, 1999. Plaintiff added this claim in May 2000, after all discovery was concluded. During discovery, defendant was not on notice that it would be defending this claim, and therefore would be prejudiced by not having an opportunity to conduct discovery on the reliance and foreseeability elements. Accordingly, defendant's motion to strike and preclude plaintiff's promissory estoppel claim is granted.

## II. Defendant's Counterclaims

■ USI has asserted counterclaims for breach of contract and unjust enrichment surrounding plaintiff's refusal to repay two separate loans provided to him by USI. Plaintiff moves for summary judgment on the counterclaims. His motion is denied.

### A. Breach of Contract

Defendant asserts that it agreed with Missigman that monies paid to him to defend against legal claims from Hagedorn, as well as the $200,000 "advance" would be repaid if the parties did not enter into a binding contract.

■ This court must look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract. *See Express Industries and Terminal Corp. v. New York State Dept. of Transportation,* 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 860, 715 N.E.2d 1050 (1999).

#### 1. The $200,000 Advance

Missigman said in his deposition that he "offered to put the money in escrow ... told Addeo if I ever left the company, you know, and went to work for somebody else, you know, I said: John, we have got a handshake here, you get the money back." (Missigman Dep. at 193.) Missigman also treated the $200,000 as a loan on his tax forms, by not declaring it as income. This evidence corroborates USI's view that Missigman was obligated to repay the monies after his contract negotiations failed, and creates a disputed fact for a jury to consider.

### 2. The Legal Fees

In support of his motion for summary judgment, plaintiff cites O'Neil's deposition testimony to support his claim that there was no arrangement to repay legal fees if Missigman were fired. O'Neil said:

> Yes, part of our understanding with Gary was that when he came on board with USI that he potentially was going to see some activity from Hagedorn although we had felt—he had in fact a separate legal opinion that he was certainly free and clear to come work for us and they—*we agreed we would help fund his legal expenses as an acquisition cost in the event he did have to pay Hagedorn for release of his contract. We had agreed that those expenses would be funded by us and ultimately tallied and subtracted from his ultimate purchase price.*

(O'Neil Dep. at 222–223) (emphasis added). The testimony cited by the plaintiff appears to support defendant's claim that this was a loan. The expenses were to be tallied and subtracted by the price ultimately paid to Missigman for his interest in the STEP Program. Yet the parties never agreed on a "purchase price" from which USI could subtract the legal expenses. This reveals a disputed fact as to whether the parties had a meeting of the minds on whether the legal fees were to be repaid absent an agreement on the "purchase price" for Missigman's interest. A jury will consider this counterclaim as well.

### B. Quantum Meruit

As noted above, if a plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result where the defendant "received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them." *Rule v. Brine,* 85 F.3d 1002 (2d Cir.1996) (quoting *Bradkin v. Leverton,* 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970)). Such a recovery for unjust en-

richment is permissible "when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another." *Id.* (quoting *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)).

There exist disputed facts as to whether there existed an agreement to repay the money for the legal fees and for the $200,000 "advance." Barring the existence of a contract, however, there also exist disputed facts as to whether Missigman would be unjustly enriched by retaining the money. The disputed facts include whether Missigman had actually acknowledged that this was a loan; whether USI's decision to make the payment was influenced by Missigman's allegedly false statement that he needed the money to make a down payment on a house; and whether the failure of the parties to come to an agreement were based on Missigman's failure to obtain proper licenses. Plaintiff's motion for summary judgment on this claim is also denied.

### CONCLUSION

For the foregoing reasons:

USI's motion for summary judgment on the breach of contract, breach of implied contract and fraud claims is granted;

USI's motion for summary judgment on the unjust enrichment claim is denied;

USI's motion to strike Missigman's claim for promissory estoppel is granted;

Zurich's motion for summary judgment on the tortious interference with business relations and fraud claims is granted; and

Missigman's motion for summary judgment on USI's counterclaims of breach of contract and quantum meruit is denied.

This constitutes the decision and order of the court.